*1066 Opinion
PETERSON, J.
Appellants, a drug dealer and his bodyguard, were convicted of two counts of felony murder,[1] after the robbery and execution-style slaying of another drug dealer and his girlfriend at the victims’ home.
Appellants raise numerous issues on appeal: (1) They both contend the trial court erred in refusing instructions based upon a theory of conspiracy, even though they were charged with aiding and abetting, not conspiracy (a similar contention was recently rejected by a majority of this court (Div. Two) in People v. Brigham (1989) 216 Cal.App.3d 1039 [265 Cal.Rptr. 486]); (2) they both contend the trial court erred in refusing to instruct on a theory of “imperfect duress” from a partner in crime, as a complete defense to the robberies and murders; (3) Novak contends the trial court prejudiced his defense by instructing with CALJIC No. 3.31.5,[2] regarding the need for a certain mental state in the mind of a defendant; (4) Novak contends the trial court erred in admitting a witness’s prior statements to the police, that Novak suggested the female victim could be tortured in order to learn where the victims’ money was, as rebuttal to Novak’s claim that the testimony to this effect at trial was a recent fabrication; (5) Novak contends the trial court erred prejudicially in failing to instruct sua sponte using CALJIC No. 6.24, regarding coconspirator statements; (6) Novak contends the long prison sentence he received was cruel and unusual punishment; and (7) Anderson contends the trial court erred in finding he gave a valid Miranda waiver and a voluntary confession. We reject these contentions and affirm.
I. Facts and Procedural History
We briefly summarize the relevant evidence in order to give factual background relevant to the legal issues.
A. The Formation of the “Hit Squad”
Prior to the crimes in issue here, appellant Novak was a relatively small-time cocaine dealer operating in the Sacramento area; appellant Anderson was sometimes employed by Novak as a guard, or in other duties as an aid in the operation of Novak’s drug business.
Novak was approached by a man named Chen, who induced Novak to give him information about other drug dealers in the area so that Chen could *1067 carry out his plan to rob and kill them. Chen stated he had evidence of Novak’s drug dealings, but had decided not to carry out a “preemptive strike” against Novak; Chen claimed, however, that he would turn Novak in to the authorities if Novak did not cooperate with him.
Chen formed a heavily armed gang of gunmen as a “hit squad” to rob and slay other drug dealers in the area. Chen’s gang was organized along paramilitary lines; and Chen boasted of his supposed prior experience in the military and CIA, together with claimed clandestine links with the Drug Enforcement Agency (DEA).[3]
Novak agreed to give Chen “intelligence” on other drug dealers who could be Chen’s targets; Novak testified, “The way I understood it was as long as I cooperated with him, then there would be no heat to me.”
Novak told Chen that Anderson, Novak’s sometimes guard, needed work and had prior military experience; so Chen recruited Anderson into the gang as well. Thereafter, Novak gave Chen information about other local drug dealers so that Chen and his squad could “hit” them. For instance, Novak was acquainted with a Colombian drug dealer, and gave Chen information as to the drug dealer’s activities and whereabouts so that Chen and his gunmen could attack him. As it happened, however, the dealer was not present at the time of the attack by Chen and his gunmen, so they had to be content with merely robbing another person who happened to be present.
B. Planning the “Hit"
The next intended victim was Novak’s major supplier of cocaine, a man with whom Novak had had differences relating to personal matters and conflicts over the cocaine business.
The victim lived on Brooks Lane in the rural area of Loomis, in Placer County near Lake Folsom, with his girlfriend. Novak gave Chen and the others information about the location of the house, the three dogs on the property, and the weapons owned by the victims. He drew a map of the house, and told Chen the victims would have large amounts of drugs, money, and jewelry on the premises. Novak indicated there would be hidden safes *1068 and suggested that, if the victims refused to tell where the drugs and money were hidden, the female victim could be tortured.[4]
Novak also described a particular item of jewelry which the victims owned and which Novak wanted, a distinctive gold pendant on a chain with a large diamond in the center.
Further, Novak related his concern that if the victims were left alive they would be able to identify him as the source of information about their activities, and “could come back on [him].” The gunmen decided that the victims would be killed during the robbery.
A variety of preparatory steps were taken prior to the crime; and on two occasions, an attack on the victims’ residence was aborted because of barking dogs or other reasons. There was also an abortive plan to have Novak arrange to buy a large amount of drugs from the victim so as to lure a drug runner to the victim’s house; thus, gunmen could rob the runner outside the house without going inside. During this period, in a bizarre episode, Novak pawned Chen’s Rolex watch to the drug dealer who later became a murder victim, in order to raise cash which Chen needed prior to the attack on the victims.
C. The “Hit” Occurs
Ultimately, on the night of December 2, 1986, the “hit” took place. Chen was present together with appellant Anderson, who was armed with a .45-caliber pistol, and two other gang members, Young and Lee, who carried Uzis.[5] Chen had supplied the weapons with devices which suppressed the sound and flash of discharge, and which caught the expended cartridges.
Anderson and Lee entered the residence, wearing ski masks, and subdued the victims. The victims were handcuffed, and their mouths and eyes were covered with duct tape.
Chen and Young then entered the residence as well. The gunmen gathered up the victims’ jewelry and weapons, together with relatively small amounts of money from one safe; but they were unable to find the large amounts of cocaine and money which Novak had said would be present.[6] Chen told the *1069 male victim to tell him where the rest of the money was or be killed; the victim said there was no such money.[7]
Chen then directed Young to kill the victims, but Young declined to do so. Anderson next tried to kill them with an Uzi, but the weapon misfired because Young had covertly removed the firing pin. Finally, Lee killed both victims by shooting them in the head.
D. Apprehension and Trial of the Murderers
After fleeing the residence and arriving at Chen’s house, the four gunmen equally divided the money they had found; Chen had also recovered the Rolex watch he had pawned through Novak. There was no evidence Novak received any of the loot. The prosecution theorized that Novak would have received and used or sold any cocaine found in the “hit.”
Lee had taken an Uzi which had belonged to the victim, and some of the victims’ distinctive jewelry. He fenced some of the jewelry and bragged to the purchaser that it came from the victims. The purchaser called the police with this information, and Lee was arrested the next day. His arrest led to the eventual apprehension of Anderson, Novak, Chen, and others involved in the killings.
By stipulation of the parties, the venue of the murder prosecutions of Novak, Anderson, Chen, and Lee was changed from Placer County, where the killings had occurred, to other counties. Lee was tried in Santa Clara County and was convicted of both murders and robberies, receiving a sentence of two consecutive terms of life without possibility of parole. Chen was tried in San Joaquin County; he was convicted and sentenced to two concurrent sentences of twenty-five years to life, together with additional consecutive sentences for robbery and for use of a firearm.
Novak and Anderson were tried together in Napa County, on the prosecution’s theory that they were aiders and abettors of the robbery and, thus, liable for the killings occurring during the course of the robbery under the felony-murder doctrine. The trial court denied Anderson’s motion to suppress his confession.
During the trial, the evidence summarized above was adduced by the prosecution; Novak testified in his own defense and denied any intention to *1070 aid in the slaying of the victims. The jury found both appellants guilty as charged.
Novak and Anderson were each sentenced to two concurrent terms of twenty-five years to life, with enhancements for the use of firearms. They timely appealed.
II. Discussion
We reject appellants’ numerous contentions on appeal, and affirm the trial court in every respect.
A. Instructions Inconsistent With the Law Governing the Crimes Charged Were Properly Refused
Appellants were tried on the theory they aided and abetted the robbery in the course of which the victims were murdered, rendering appellants liable therefor under the felony-murder rule, Although appellants were not charged as conspirators, they nevertheless contend the trial court erred by refusing to instruct on principles relevant to conspiracy which they claim might have aided their defense, especially principles derived from CALJIC No. 8.26 to the effect that in a conspiracy prosecution coconspirators are only liable for an act of a principal which is “in furtherance of a common design and agreement to commit [robbery] or is an ordinary and probable result of the pursuit of that design and agreement. . . .”
Appellants sought this instruction in order to support an argument to the jury that they were not liable for the murders because the killings occurred outside the common design, as the “independent idea” of Chen or Lee, the actual gunman. The trial court refused to give appellants’ instruction modeled on CALJIC No. 8.26, since this was not a conspiracy prosecution; and it refused to allow appellants to argue their “independent idea” theory to the jury.[8]
The trial court’s rulings were correct. Instructions on conspiracy principles would have constituted erroneous and misleading statements of the law that was in fact applicable here to the charge appellants aided and abetted a robbery which was the predicate felony in a felony-murder prosecution. (People v. Brigham, supra, 216 Cal.App.3d at p. 1050.)
*1071 The prosecution theory in this case was that appellants were liable as aiders and abettors for the robbery, since the robbery of the victims was a natural, reasonable, and probable consequence of their knowing and intentional acts; and that since appellants were, thus, liable for the robbery, they were also liable for the killings perpetrated during that robbery under the felony-murder rule, even if those killings were not natural, reasonable, and probable consequences of the robbery itself.
Appellants contend, first, that they were entitled to certain instructions on conspiracy principles in the context of the aider and abettor instructions, a position we rejected in Brigham.
Second, appellants contend, misapplying Brigham and contrary to years of precedent concerning the felony-murder rule, that one who aids and abets the predicate felony (robbery) during which murders occur nonetheless escapes liability for those homicides if they were not the “natural and reasonable or probable consequence[ ]” of that predicate felony. Appellants’ second contention would be correct only if this prosecution, like the one in Brigham, were based solely on an aider and abettor theory, without reference to the felony-murder rule. However, in this felony-murder case, the trial court correctly instructed the jury that appellants could be liable as aiders and abettors for the robbery if it was a natural, reasonable, or probable consequence of appellants’ acts; and that, if appellants were liable for the robbery as aiders and abettors, they were also liable for killings perpetrated during the robbery under the felony-murder rule.
Thus, we will hold: (1) Appellants were liable for the robbery as aiders and abettors if that criminal act was a natural, reasonable, or probable result of their knowing and intentional acts: (2) Appellants were guilty of first degree murder for any killings perpetrated during a robbery they aided and abetted.
1. Instructions on Conspiracy Do Not Define Aiding and Abetting
This court (Div. Two) recently reviewed the distinction between conspiracy on the one hand and aiding and abetting on the other: We held that, although the two doctrines have many similarities, there are significant differences between the two theories; a defendant in a murder prosecution has no right to defensive instructions regarding the limits of a conspirator’s liability when the defendant is not in fact prosecuted on the theory he is derivatively liable as a conspirator, but on the different theory of derivative liability as an aider and abettor. (People v. Brigham, supra, 216 Cal.App.3d at p. 1050.)
*1072 “Appellant[s’] attempt to engraft the conspiracy instruction we have discussed (CALJIC No. 6.15 [which provides that a conspirator is not liable for a criminal act which is the ‘independent product’ of the mind of another conspirator] . . .) on to the aider and abettor instructions the court gave . . . must wholly fail as foreign to the law of aider and abettor liability for the reasons we now consider.” (216 Cal.App.3d at p. 1050.)
“This derivative criminal liability of an aider and abettor centers on causation. The law’s policy is simply to extend criminal liability to one who knowingly and intentionally encourages, assists, or influences a criminal act of another, if the latter’s crime is naturally and probably caused by (i.e., is the natural and probable consequence of) the criminal act so encouraged, assisted, or influenced.” (216 Cal.App.3d at pp. 1052-1053.) “The Supreme Court has never said or implied as a derivative of these principles, or otherwise, that the ultimate focus of a jury’s inquiry must be directed to whether a principal’s act on which an aider or abettor’s derivative criminal liability turns is an ‘independent product’ of the principal’s own mind. To the contrary, the ultimate jury analysis of aider and abettor liability in a case such as this hinges neither on whether the principal’s criminal act was intentional, nor on whether it differed from a criminal offense the aider and abettor agreed to facilitate.” (Id. at pp. 1050-1051.)
“A subjective inquiry as to whether the perpetrator’s committed crime was the ‘independent product’ of his mind, so as to lead to exculpation of the aider and abettor on that basis, is improper because the ultimate factual determination of the jury as to the liability of an aider and abettor is based instead on an objective analysis of causation; i.e., whether the committed crime was the natural and probable consequence of the principal’s criminal act the aider and abetter knowingly encouraged or facilitated.” (216 Cal.App.3d at p. 1051; accord, People v. Torres (1990) 224 Cal.App.3d 763, 769 [274 Cal.Rptr. 117] [“The aider and abettor’s liability ‘is a question of legal causation independent of any intention that the result obtain[ed], [Citations.]”’ Quoting People v. Rogers (1985) 172 Cal.App.3d 502, 515 [217 Cal.Rptr. 809], and relying upon our decision in People v. Brigham, supra, 216 Cal.App.3d at p. 1053, italics added by the Brigham court.].)
Here, the jury was properly instructed, per CALJIC No. 3.00 (1984 rev.), that “One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly and intentionally aided or encouraged.” (Italics added.)
The jury was also properly instructed, per CALJIC No. 8.27 (1984 rev.), on the consequences of the felony-murder rule in this case: “If a human *1073 being is killed by any one of several persons engaged in the perpetration of, or attempt to perpetrate, the crime of robbery, all persons who either directly and actively commit the act constituting such crime or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental." (Italics added.)
The trial court, thus, correctly refused appellants’ request that it “engraft” into the instructions on aiding and abetting and felony murder, which were the theories under which appellants were charged, those limiting concepts of conspiracy law which might have assisted appellants if they had been charged with, or prosecuted on the theory of, committing robbery as coconspirators. (People v. Brigham, supra, 216 Cal.App.3d at pp. 1050-1051.) The trial court was no more obliged to instruct on defenses to conspiracy charges here than it was obliged to instruct on the defenses to burglary: Even though the evidence apparently disclosed that a burglary of the victims’ home occurred—since the attackers entered the home bent on robbery, and even though appellants could have been liable for murder under the felony-murder rule as a result of such a burglary (Pen. Code, § 189), appellants were not charged with burglary or with felony murder as a result of a burglary; it would have been absurd to instruct on defenses to such a charge.
Further, even though such instructions on a crime not charged, like instructions on conspiracy, might have been orthodox statements of the law relative to other crimes not relevant here, and might have found some support in the evidence, neither theory was employed by the prosecution or could have resulted in appellants’ conviction. It is the function of the prosecution, not the trial or appellate court, to decide the charges and theories upon which guilt may be established, in light of the evidence which the prosecution is confident it can adduce at trial. (People v. Brigham, supra, 216 Cal.App.3d at pp. 1051-1052.) A defendant is not entitled to instructions on defenses to charges not made against him which are neither necessarily included nor lesser related offenses. (Ibid.) “Clearly a defendant has no general right to have the jury presented with a shopping list of alternatives to the crimes charged by the prosecution.” (People v. Geiger (1984) 35 Cal.3d 510, 514 [199 Cal.Rptr. 45, 674 P.2d 1303]; accord, People v. Moore (1990) 224 Cal.App.3d 234, 238 [273 Cal.Rptr. 680].)
The trial court did not err in declining to instruct on the limits to conspiracy liability where appellants’ derivative liability for robbery, as the *1074 predicate crime to felony murder, was prosecuted solely on the theory they aided and abetted that robbery.
2. Instructions on Aiding and Abetting Do Not Define Felony Murder
The trial court also properly refused to instruct on modifications which appellants proposed to CALJIC No. 8.27 (1984 rev.), the text of which instruction, as given by the trial court, we have quoted ante. The proposed modifications would have had the effect of repealing, in part, the felony-murder rule: Appellants sought an instruction that they could only be liable under the felony-murder rule if the killings were “the natural and reasonable or probable consequence of the acts [they] knowingly and intentionally aided and abetted.”
This would certainly be a correct statement of the principles of aider and abettor liability where the felony-murder rule does not apply, as is made clear by our discussion of those principles, ante, and by Brigham, supra, an aiding and abetting case in which the felony-murder rule was not employed by the prosecution. However, in this case it was charged that the killings took place in the course of another independent felony, robbery; and therefore, appellants, who aided and abetted the robbery, could potentially be liable for murder committed in the course of that robbery, even though the killings were not natural, reasonable, or probable consequences of the robbery. (People v. Dillon (1983) 34 Cal.3d 441, 477 [194 Cal.Rptr. 390, 668 P.2d 697].)
The felony-murder rule is not in fact limited to killings which seem “probable”; it includes “a variety of unintended homicides resulting from reckless behavior, or ordinary negligence, or pure accident; it embraces both calculated conduct and acts committed in panic or rage, or under the dominion of mental illness, drugs, or alcohol; and it condemns alike consequences that are highly probable, conceivably possible, or wholly unforeseeable. ’’ (34 Cal.3d at p. 477, italics added.)
“The killing may be wilful, deliberate and premeditated, or it may be absolutely accidental; in either case the slayer is equally guilty since the statute applies to all homicide so committed, not merely to such as might be planned as a part of the execution of the felony intended; and it is proper so to instruct the jury. [Citations.]” (People v. Cabaltero (1939) 31 Cal.App.2d 52, 57 [87 P.2d 364].) “With respect to any homicide resulting from the commission of or attempt to commit one of the felonies listed in the statute, our decisions generally hold [Penal Code] section 189 to be not only a degree-fixing device but also a codification of the felony-murder rule: no *1075 independent proof of malice is required in such cases, and by operation of the statute the killing is deemed to be first degree murder as a matter of law.” (People v. Dillon, supra, 34 Cal.3d at p. 465.)
“In defendant’s . . . argument, he claims that the evidence established, at best, only an intention to commit robbery and that someone was killed during the robbery; consequently, the evidence was insufficient for conviction of murder. In essence, defendant is asking us to abrogate the felony-murder rule; however, this we cannot do. This contention has been answered adversely to defendant’s position in People v. Dillon [citation]. The rationale need not be repeated here." (People v. Harpool (1984) 155 Cal.App.3d 877, 888 [202 Cal.Rptr. 467]; cf. also People v. Ellenberg (1958) 165 Cal.App.2d 495, 500 [331 P.2d 1053] [All persons who aided a robbery were liable for felony murder when one robber accidentally killed someone. “The conspirator and the abettor stand in the same position in this regard— the killing is his act and his murder regardless of accident.”].)
Thus, the trial court properly instructed on felony murder.
3. Appellants ’ Arguments for a Limitation of the Felony-murder Rule Are Inapplicable
While disclaiming any attempt to make another frontal assault upon the validity of the felony-murder rule, and recognizing that People v. Dillon binds us in this respect, appellants nevertheless offer criticism of the weaknesses of the doctrine expounded in the cases cited in the previous section, beginning with People v. Cabaltero, supra, 31 Cal.App.2d 52, which they contend was a wrongly decided case and the source of much mischief to follow; they suggest the asserted illogical and sometimes inequitable results of the felony-murder doctrine require us to limit its application only to those homicides which are the natural, reasonable, or probable consequence of the acts of an aider and abettor.[9] We reject this argument.
*1076 Initially, we must observe that we are an intermediate appellate court; appellants’ suggestion is one not embraced by our Supreme Court and is in fact inconsistent with its language in People v. Dillon, supra. The Dillon precept that the felony-murder doctrine condemns as murder all killings perpetrated during a felony, even though the killings need not be probable or conceivably possible and may even be “wholly unforeseeable” (34 Cal.3d at p. 477), cannot be reconciled with appellants’ theory. A killing which was a “wholly unforeseeable” result of a defendant’s acts would be neither a natural, reasonable, nor probable consequence. (Cf. also People v. Thompson (1990) 50 Cal.3d 134, 171 [266 Cal.Rptr. 309, 785 P.2d 857] [“The only nexus required is that the felony and the killing be part of a continuous transaction.”]; People v. Floyd (1970) 1 Cal.3d 694, 707 [83 Cal.Rptr. 608, 464 P.2d 64] [“[Appellants ask] us to . . . overrule People v. Cabaltero . . . . The suggestion is without merit.”], disapproved on another point in People v. Wheeler (1978) 22 Cal.3d 258, 287, fn. 36 [148 Cal.Rptr. 890, 583 P.2d 748].)
The orthodox instruction on the first degree felony murder liability of aiders and abettors, CALJIC No. 8.27 (1984 rev.), ante, contains no such limitation of liability to only “natural and reasonable or probable consequences,” as does CALJIC No. 3.00 (1984 rev.) which the trial court gave in the context of liability for the robbery.[10] The Attorney General actually suggests the giving of CALJIC No. 3.00 (1984 rev.) in this context may have been error favorable to appellants, since it may have incorrectly suggested to the jury that appellants could only be liable for the murders if they were natural, reasonable, or probable consequences of appellants’ acts. “It is an interesting theoretical point but one that we need not address in this case, as the instruction complained of could not have prejudiced [appellants].” (People v. Stankewitz (1990) 51 Cal.3d 72, 92 [270 Cal.Rptr. 817, 793 P.2d 23].)[11]
*1077 Moreover, in any event, the facts in the record before us do not indicate appellants could have been convicted here of felony murder as a result of killings which were not natural, reasonable, or probable consequences of the acts they aided and abetted. This is obviously true of appellant Anderson, who was actually present at the time of the robberies and murders and actually attempted to execute the victims, but could not do so because a confederate had covertly removed the firing pin from the Uzi Anderson tried to use.
The same is true of appellant Novak. The prosecution’s evidence showed that Novak (1) actually identified the victims to the gunmen as suitable targets, mapped out their residence, described their dogs and weapons, disclosed that they would have large quantities of money and drugs which would make the attack worthwhile, and provided his own bodyguard and Uzi for the gunmen to use in the attack; (2) suggested that if the victims refused to disclose where their money was hidden, the female victim could be tortured until the whereabouts of the money was revealed; and (3) urged that the victims be slain in order to prevent them from deducing that Novak was the person who had given the gunmen this information. It is obvious under this evidence that the slaying of the victims was a natural, reasonable, and probable consequence of these acts by Novak; no reasonable trier of fact could have concluded otherwise.
Finally, the same was true even under Novak’s evidence relevant to this issue. Novak testified he had in fact identified the victims to the gunmen— revealing their address, mapping out their residence, describing their guns and dogs, and assuring the gunmen of the presence of large amounts of money and drugs.[12] Novak denied suggesting that the female victim should be tortured and the victims killed; he contended he was explicitly not told of the gunmen’s plan to kill the victims; and his testimony to this effect was confirmed in part by that of another confederate, Young, who testified that Novak suggested the female victim should be tortured, but was not told that the gunmen planned to kill the victims in any event.
According to Novak, Chen and the other members of what Novak concedes was a “hit squad” were homicidal maniacs who had an independent *1078 plan to kill drug dealers after robbing them, and Novak never intended for the victims to die. However, even under Novak’s evidence, he told heavily armed homicidal maniacs in a paramilitary “hit squad” about the presence of two vulnerable drug dealers living in a rural area who were likely targets, and instructed the gunmen in the methods which could be used to attack, subdue, and rob them. Whether the gunmen had an “independent idea” to kill the victims or whether appellants also concurred in that plan as the prosecution’s evidence showed, it is impossible to see how it could reasonably be concluded that the deaths of the victims in such circumstances could have been an unnatural or improbable consequence of appellants’ admitted acts.[13]
Thus, as our Supreme Court held in People v. Terry (1970) 2 Cal.3d 362, 402 [85 Cal.Rptr. 409, 466 P.2d 961], it was proper in any event for the trial court to refuse to instruct that a conspirator who aided the robbery could only be liable for the deaths of the victims if they were a “natural and reasonable or probable consequence[ ]” of the robbery: “Since the proposed instruction—although correctly stating the law [of conspiracy]—had no application to the facts of the case it was properly rejected. [Citation.].” (See also People v. Jones (1989) 207 Cal.App.3d 1090, 1098 [255 Cal.Rptr. 464] [“In light of evidence that appellant knew [the actual killer] was a violent, desperate character and that he was armed with a gun for the purpose of committing robbery, the [claimed] error was harmless beyond a reasonable doubt.”]; accord, People v. Cox (1991) 53 Cal.3d 618, 669 [280 Cal.Rptr. 692, 809 P.2d 351]; cf. also Yates v. Evatt (1991) 500 U.S. _ [114 L.Ed.2d 432, 449-452, 111 S.Ct. 1884, 1894-1895].) “[N]o reasonable jury would have concluded that the homicides were not a reasonable and probable consequence of such violence.” (People v. Cox, supra, 53 Cal.3d at p. 669.)
We find no error in the jury instructions regarding aiding and abetting and felony murder.
B. The Trial Court Properly Rejected Appellants’ Proposed Instruction on “Imperfect Duress”
Raising another inventive but ultimately unpersuasive argument of apparent first impression, appellants contend the trial court erred when it refused to instruct on their theory, in this felony-murder prosecution, that they were not guilty because they were subject to “imperfect duress” from *1079 the ringleader of the “hit squad” they aided. Although the trial court instructed at appellants’ request on the conventional defense of duress using CALJIC No. 4.40 (1979 rev.),[14] the trial court refused to craft an instruction on “imperfect duress” by eliminating the requirement of an objective standard, i.e., that any duress be such as would cause “a reasonable person” to be put in fear of his life. We affirm the trial court’s ruling.
1. The Case Law Does Not Support a Defense of Imperfect Duress
Apparently no court has ever actually held in a published decision that the defense of “imperfect duress” in fact exists under California law, even though this nebulous concept finds some indirect support in dicta or by forced analogy to the holdings of other cases. Further, contrary authority— some of it from this very court (Div. Two)—weighs strongly against the recognition of such a defense in these circumstances. (See People v. McKelvy (1987) 194 Cal.App.3d 694 [239 Cal.Rptr. 782]; People v. Coad (1986) 181 Cal.App.3d 1094 [226 Cal.Rptr. 386].)
Our review of the case law must begin with People v. Flannel (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1]. Flannel did not deal with a theory of imperfect duress at all; nor did it endorse the suggestion that an imperfect duress defense was nevertheless a good and complete defense. Rather, Flannel held that where a claim of self-defense was imperfect, because a reasonable person would not have believed himself in danger, nevertheless even an objectively unreasonable, and therefore imperfect, belief to that effect could negate the element of malice aforethought which was prerequisite to a charge of murder based upon an intent to kill—and though not a complete defense, would reduce the crime to manslaughter. (Pp. 672, 674-680.)
Flannel was misapplied by analogy in certain dicta contained in People v. Smith (1986) 187 Cal.App.3d 666 [231 Cal.Rptr. 897]. Smith correctly affirmed a conviction by holding there was no duty to instruct sua sponte on the theretofore unrecognized defense of “imperfect duress” under the facts there presented; but in dicta, it distorted Flannel’s logic to the extent of appearing to recognize the concept of “imperfect duress” as a complete *1080 defense negating wrongful intent—despite the obvious differences between self-defense and duress; and despite the even more critical distinction between a factor in mitigation which negates malice, thereby resulting in a conviction of a lesser crime, and a complete defense negating intent which would result in acquittal. (P. 679.)
Presiding Justice Kline cogently criticized this dicta in his separate opinion in People v. McKelvy, supra: “The recent case of People v. Smith [citation] held that trial courts must instruct sua sponte ‘whenever the evidence suggests an honest belief, which if reasonable, would absolve the defendant of liability for the charged crime. Under such circumstances, an honest but unreasonable belief may negate the appropriate specific intent element.’ (Id., [187 Cal.App.3d] at p. 679, fn. 8, italics in original.) While we agree that the unreasonable belief may negate malice, we disagree with Smith to the extent that it requires use of the unreasonable belief instruction where it would serve to acquit the defendant.” (194 Cal.App.3d at p. 703, fn. 5.)[15]
Other authority which predates People v. Smith, but was not cited therein, is also inconsistent with the notion based upon miscitation to Flannel that a person’s totally subjective and objectively unreasonable belief that he is in some danger should be a complete defense when he attacks a third party. For instance, in People v. Subielski (1985) 169 Cal.App.3d 563, 567 [211 Cal.Rptr. 579], then Presiding Justice Panelli squarely rejected this very argument: “The People contend, however, defendant’s reliance on Flannel [in arguing that imperfect duress could negate the specific intent required for robbery] is misplaced. Again, we must agree, [ft] There is no authority to support defendant’s theory.”
Further, in People v. Keating (1981) 118 Cal.App.3d 172, 178 [173 Cal.Rptr. 286], Justice Poché, relying upon the same case of People v. Flannel, noted that instructions on duress “are required only if there was substantial evidence appellant participated in the robbery because he reasonably believed his life would be in danger if he did not. (People v. Flannel . . . .” (Italics added; cf. also People v. Williamson (1985) 172 Cal.App.3d 737, 753-754 [218 Cal.Rptr. 550] [“Based on this record defendant’s request that the court give an instruction on unreasonable belief of peril seems absurd.” Defendant’s claim of imperfect duress from a partner in crime was rejected, where defendant testified he beat someone to death only because his confederate “ ‘was a lot bigger than me and he was really buffed and he was in [sic] lifting weights and he was very aggressive . . . .’” Citing Flannel, supra, 25 Cal.3d 668, and Keating, supra, 118 Cal.App.3d 172.].)
*1081 Moreover, as Justice Smith (with Justice Rouse concurring) observed in People v. Coad, supra, “Justice Tobriner’s remarks in Flannel were addressed to the judicially created—and now legislatively overruled—awareness-of-societal-duty component of malice aforethought.” (181 Cal.App.3d at p. 1107, fn. omitted.) With the redefinition and limitation of malice aforethought by the 1981 and 1982 amendments to Penal Code section 188 (Stats. 1982, ch. 893, §4, p. 3318; Stats. 1981, ch. 404, § 6, p. 1593), it might be doubly questionable whether a defense of imperfect duress could be conjured up from the Flannel decision by analogy.[16]
We note that the same court which decided People v. Smith, supra, 187 Cal.App.3d 666, has recently concluded, in People v. Uriarte (1990) 223 Cal.App.3d 192, 197 [272 Cal.Rptr. 693], that an honest but unreasonable belief defense would mitigate murder to manslaughter by negating malice, without repeating the controversial dicta that such a belief could afford a complete defense by negating intent. (Cf. also People v. Goins (1991) 228 Cal.App.3d 511 [279 Cal.Rptr. 42] and People v. Jacobs (1991) 230 Cal.App.3d 1337 [281 Cal.Rptr. 733] [both rejecting the rationale of People v. Smith].)
In sum, we find no authority which actually holds a complete defense of “imperfect duress” exists under California law. The notion is rejected by numerous cases with which we concur.
2. The Defense of “Imperfect Duress” Was Also Not Available to Appellants Here Because It Is Inconsistent With the Felony-murder Rule
Even if imperfect duress might otherwise mitigate a crime from murder to manslaughter, appellants were charged with murder here only under the felony-murder rule. Under the felony-murder rule, by definition, a manslaughter or any other killing perpetrated in the commission of a felony is first degree felony murder.
The principle is illustrated by People v. Balderas (1985) 41 Cal.3d 144 [222 Cal.Rptr. 184, 711 P.2d 480]. Balderas was a case arising from a victim’s death during a robbery; Justice Grodin rejected the claim that Balderas was entitled to instructions that the killing could be a manslaughter if the victim had provoked the killing, since such a killing could not be less than first degree murder under the felony-murder rule: “Of course, neither *1082 ‘heat of passion’ nor provocation can ever reduce a murder properly based on the felony-murder doctrine to voluntary manslaughter, and an instruction to that effect would be error. This is so because ‘malice,’ the mental state which otherwise distinguishes murder from voluntary manslaughter, is not an element of felony murder. The only mental state required for felony murder is that necessary for commission of the underlying felony. (People v. Dillon . . . .)” (P. 197.)
Obviously, the same reasoning applies here. Even if the defense of imperfect duress could negate malice aforethought, malice aforethought is not an element of either felony murder or robbery. Hence, a defense tending to negate malice aforethought is simply irrelevant and provides no defense at all to felony murder. Were we to rule otherwise, a purely accidental killing in the commission of a felony would be first degree murder, while a much more morally blameworthy intentional killing, mitigated in part only by imperfect duress, would constitute a lesser offense. “Such cannot be the law. We conclude there was no instructional error.” (41 Cal.3d at p. 197.)
Finally, we also reject appellants’ argument that the lesser crime of manslaughter, which was eliminated here by the felony-murder rule, might somehow be resurrected on “equitable” grounds, or could become available through mitigation of the crime under an imperfect duress rationale because “further thought may have identified an inherently dangerous felony or misdemeanor committed by appellants that required only a true general intent and .... could have formed the basis of a second-degree felony murder or involuntary manslaughter conviction.”[17]
We would plainly be turning the felony-murder rule on its head if we concluded the rule may be abrogated whenever conviction of a lesser offense might in retrospect have been possible. The very purpose of the rule as reified by People v. Dillon, supra, 34 Cal.3d 441, is to provide that a killing perpetrated during certain felonies is first degree murder, not some lesser crime; and we decline appellants’ invitation to repeal it.[18]
*1083 In this felony-murder case, the trial court properly refused to instruct on “imperfect duress.”
II.C. - II.G.*
III. Disposition
The judgments of conviction are affirmed.
Benson, J., concurred.

All murder . . . which is committed in the perpetration of, or attempt to perpetrate, . . . robbery ... is murder of the first degree . . . .” (Pen. Code, § 189.)

All CALJIC references are to the fourth edition, 1979 bound volume and/or its pocket parts.

In fact, the DBA had not employed Chen, despite Chen’s professed interest in becoming an informer, because he was not willing to have the DBA conduct a background investigation; the agents who spoke to Chen were also suspicious of him, and were concerned that he might try to involve the government in illegal activities. One witness who declined to join Chen’s gang described Chen as a dangerous maniac who freely discussed his plans to eliminate drug dealers from the area through robberies and executions. The witness testified that Chen was also obsessed with his hatred of “rampant” drug dealers and Tom Hayden and Jane Fonda; according to the witness, “I thought [Chen] was looney tunes.”

One of Chen’s gunmen, Bailey, had been recruited to the gang after he told Chen about the method Bailey had devised to make a victim reveal where a motorcycle was hidden: Bailey put the victim’s hand in a vise, and then used a blowtorch to burn the victim’s fingers until he broke down.

Novak stayed home with friends who provided him with an alibi.

After the crime, the authorities recovered $142,300 from a hidden floor safe in the garage and another $38,400, together with 16 pounds of cocaine wrapped in plastic ziplock bags, from a locked file box.

Bailey, who had been recruited to the gang after he described torturing another victim with a blowtorch, had had second thoughts about participating in the attack and was not present. It does not appear that the victims were in fact tortured, although the corpse of the female victim had a stab wound in the neck, in addition to the fatal gunshot wound.

The court did allow appellants to argue that the criminal act they allegedly aided and abetted was a proposed robbery of a different victim (a drug runner) at a location outside the victims’ home, and that the robbery of the victims on which appellants’ felony-murder conviction was predicated was not a “natural and reasonable or probable consequence[ ]” of that criminal act. (See CALJIC No. 3.00 (1984 rev.).) The jury obviously rejected this defense.

For instance, one appellant postulates that, if a plane had crashed into the victims’ house during the robbery and killed them, appellants might under some Draconian application of the felony-murder doctrine be guilty of first degree murder—since the victims were accidentally killed during the commission of a felony—even though appellants’ actions might not have increased the risk of harm to which the victims were subject. Clearly no such questions are raised by the facts of appellants’ case. Here, the killings were very clearly causally related to the robbery. Appellants’ hypothetical argument is particularly inapposite because conviction of felony murder is limited to all persons who either directly commit robbery as the predicate crime or who, with the requisite knowledge and intent, “aid ... its commission” when “a human being is killed by any one of several persons engaged in the perpetration of or attempt to perpetrate, the crime of robbery . . . .’’(CALJIC No. 8.27 (1984 rev.) as given here, italics added.) It is difficult to ascertain how an airplane randomly crashing into the scene of a robbery is engaged in the commission or attempted commission of that crime. As Professor Robinson has noted, “Typically, the complicity aspect of the felony-murder rule imputes both *1076 the conduct and the mental state of the killer co-felon to his accomplices. See People v. Cabaltero. . . (Robinson, Imputed Criminal Liability (1984) 93 Yale L.J. 609, 618, fn. 25.)

In the trial court’s words to counsel, “Now, [CALJIC No. 3.00 (1984 rev.)] is going to be saying that an aider and abettor is liable for the natural and probable consequences of whatever acts he encourages, and I don’t want to be heard as saying that you can’t argue [to the jury in closing statements] that he only encouraged a robbery outside the house, he didn’t encourage a robbery inside the house, and therefore a killing inside the house . . . wasn’t in the commission of the crime he aided and abetted, [¶] . . . [¶] So I don’t know what the jury is going to be thinking, and I don’t know how your argument is going to be coming out. . . . [T]he ruling does mean that if the jury finds that your client was an aider and abettor to the robbery of [the victims] inside that house, that he does not escape liability. . . under the felony murder rule by reason of the fact that Chen harbored an undisclosed intention, if the jury so finds, to kill people . . . .” (Italics added.)

As we observed in People v. Brigham, supra, 216 Cal.App.3d at pages 1047-1050, the Supreme Court in People v. Durham (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d *1077 198] quoted the “natural and probable” (italics omitted) definition of an aider and abettor’s liability which emerged from People v. Villa (1957) 156 Cal.App.2d 128 [318 P.2d 828], Villa, however, was not a felony-murder case; and the Supreme Court did not have occasion to address in Durham, which was prosecuted on an aider and abettor theory as was this one, any contention that the “natural and probable” limitation might be inconsistent with the law of felony murder—which, as later reviewed in Dillon, causes liability for murder to attach even where the killing was an unforeseeable accident which was not a natural and probable consequence of the predicate felony.

Novak denied he had given this information in order to aid and abet a robbery of the victims. The jury necessarily rejected this factual contention under proper instructions; it is hard to see how a reasonable trier of fact could have reached any other conclusion.

The trial court had correctly allowed counsel to argue that the robbery of the victims was not a natural or probable consequence of Novak’s acts, but Novak’s counsel apparently did not try to explicitly so argue. The trial court’s ruling properly foreclosed Novak’s argument that, even though he aided and abetted the robbery of the victims, he was not liable for their deaths since they were killed by Novak’s partners in crime.

CALJIC No. 4.40 (1979 rev.), as given by the trial court, provides: “A person is not guilty of a crime when he engages in conduct, otherwise criminal, when acting under threats and menaces under the following circumstances: [¶] 1. Where the threats and menaces are such that they would cause a reasonable person to fear that his life would be in immediate danger if he did not engage in the conduct charged, and [¶] 2. If such person then believed that his life would be so endangered. [¶] This rule does not apply to threats, menaces, and fear of future danger to his life.” (Italics added.)

Justices Smith and Rouse further distanced themselves from the Smith dicta by concurring in the result in McKelvy, on the grounds that under the evidence there was no sua sponte duty at all to instruct on this point. (People v. McKelvy, supra, 194 Cal.App.3d at pp. 707-708.)

Presiding Justice Kline concurred and dissented in Coad on grounds not here relevant; as his subsequent opinion in McKelvy makes clear, in any event, imperfect self-defense is not a complete defense to first degree felony murder. (People v. McKelvy, supra, 194 Cal.App.3d at p. 703, fn. 5.)

No authority is cited for the highly questionable suggestion that a trial or appellate court must examine the record of a felony-murder case in search of any uncharged and legally unrelated misdemeanor or felony which the defendant also committed. Moreover, the uncharged crime which the facts most readily suggest (appellants suggest none) is burglary, which also would have supported application of the felony-murder rule here.

The Attorney General also argues that the imperfect duress concept was unavailable to appellants because Penal Code section 26, subdivision Six, provides that the perfect duress defense is unavailable if “the crime be punishable with death.” Under the Attorney General’s argument, the trial court erred in instructing even on perfect duress, since felony murder is punishable by death; and a fortiori the concept of imperfect duress was unavailable. This argument finds apparent support in People v. Petro (1936) 13 Cal.App.2d 245, 247-248 [56 P.2d 984], in an unusual interpretation of the governing statute. The crime of robbery, per se, is not punishable by death. (Pen. Code, § 213.) If appellants were not guilty of robbery *1083 because they in fact acted reasonably, under duress, it is hard to see how their innocence of robbery could serve as a predicate felony under the felony-murder rule. Likewise, we reject the Attorney General’s argument that appellants did not in any event present evidence warranting instruction on a defense of perfect duress; as the trial court found, there was some evidence which if believed by the jury might have acted to excuse the crimes as a result of duress from Chen and the other gunmen. The jury resolved that issue against appellants.

See footnote, ante, page 1646.