Filed 8/28/13  P. v. Brown CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>YOLANDA BROWN,<br><br>    Defendant and Appellant. | G046404<br><br>(Super. Ct. No. 08NF4115)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed in part, reversed in part, and remanded for resentencing.

Eric S. Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Teresa Torreblanca, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted Yolanda Brown of first degree special circumstance murder, attempted murder, two counts of robbery, and active participation in the Rollin 20's criminal street gang, and found true allegations she vicariously discharged a firearm causing great bodily injury and death. The trial court sentenced her to life without the possibility of parole (LWOP).

Brown argues the trial court erred by refusing to instruct the jury with CALCRIM No. 3500 on jury unanimity and CALCRIM No. 240 on causation, and committed a sentencing error by concluding it lacked discretion to strike the special circumstance finding or otherwise impose a sentence other than LWOP. We find merit in her last point only and remand the matter for a new sentencing hearing. In all other respects, the judgment is affirmed.

FACTS

After enjoying an evening at the Boogie nightclub in Anaheim, Dwayne Washington, Armand Jones, Giovanni Boyd, and Brent Hurd went to a nearby Denny's restaurant to get something to eat. Jones, Washington, and Boyd were wearing gold chains and diamond stud earrings. Jones also had an expensive watch, and Washington was wearing some popular and expensive shoes. They were celebrating the fact Jones had just finished working in a movie entitled, *Freedom Writers*.

The group paid the Denny's manager $20 to get seated ahead of a number of other people. A group of women complained, and the guys invited them to join them at their table. Ronnell Spencer, the owner of a clothing store Jones frequented, also sat down with them.

After some period of time, Washington and Boyd decided to go to the restroom. Washington was in the restroom with Boyd when a group of four African-

American males and one African-American female "dressed like a guy" entered.[1]  The female was later identified as Brown.  Within minutes, a couple more African-American men came into the restroom and blocked the exit.

Brown and one of the men approached Washington and said, "Give me all your stuff, cuz."  Washington recognized one of the men in the restroom, Jarrell Kelly, from high school, and he said to Kelly, "I know you . . . you gonna let your boys do this to me?"  Stanley Simon, one of the robbers, asked Kelly, "You know this nigga, cuz?"  Kelly said, "no."  Brown and one of the men went through Washington's pockets, and took his cell phone, the gold chain from around his neck, and his shoes while another man, most likely Simon, pointed a gun at Washington's head and threatened to shoot.[2]

Brown left the restroom, while three men forced Boyd out of the bathroom stall.  One of the men pointed a gun at him, and he relinquished the contents of his pockets and his shoes.  Boyd heard someone say, "This is 20's," and he knew there was a Long Beach criminal street gang known as the Rollin 20's.

Brown quickly returned to the restroom and said someone else "with chains on" was coming.  She walked back out and Jones walked in.  As Jones opened the door, he saw Washington with his hands up and asked what was happening.  The man who had held a gun to Washington's head said, "give me your chains, cuz."  Jones refused.  He hit the man, a brief scuffle ensued, and everyone ran out of the restroom.  The robbers headed outside the Denny's with Jones hot on their trail.

---

[1] A witness said the woman was wearing a cream and brown stripped polo shirt, and tan Lugz boots.  She had her hair in a ponytail, pierced eyebrows and a pierced lip.  Another witness noticed a female involved in the incident and said the woman had her hair tied back in a pony tail, was wearing baggy clothes and a black, baggy hooded sweatshirt.  This witness also noticed Brown had a lip piercing and quite a few ear piercings.

[2] Washington identified Damon Hill as the gunman, although he later said Simon had been the gunman.  In any event, Washington said the gunman wore black clothing, a black hoodie, and a Pirates baseball cap.

Washington tried to warn Jones about the guns, but he could not catch him. Spencer jumped up from his table, ran through the Denny's entrance, and then outside after Jones. He produced a gun from somewhere, raised it over his head, pointed it in the general direction of Jones's attackers, and fired several shots. Jones's attackers returned fire, and Washington saw Jones stumble back through the Denny's front door. Jones asked his friend for help and then fell to the floor. Washington said Jones coughed up some blood and died. In addition, someone had shot Spencer in the head.

Some days later, Washington, Boyd, and Hurd searched MySpace in an effort to find pictures of the robbers. Washington identified Kelly, Hill, and Brown from photographs on the Internet.

Investigating officers collected several bullets, bullet fragments, and cartridge casings from the Denny's parking lot. The parties stipulated the bullets, bullet fragments, and cartridge casings came from four different guns. The evidence indicated Spencer fired a .45-caliber handgun, but Jones had been killed with a .357 or .38-caliber gun.

On December 22, 2008, Brown made a statement to police. She admitted going into the men's restroom, asking what was going on, and then walking out. She denied participating in the robberies.

Ebony Aguilar testified she had gone to the Boogie nightclub that night with Hill and Kalup Hartley. They met Charles Reynolds and Kelly at the club. She knew these men were associated with the Rollin 20's. When the club closed, Aguilar, Reynolds, and Hartley went to Denny's. While they were waiting for a table, Aguilar saw Jones get up from his table and go to the restroom. Members of the Rollin 20's followed him, but she did not see Brown among them. In fact, she noticed a fight break out by the doors to the men's restroom and saw a different female in the fray. This unidentified woman said she had Jones's chain.

4

Aguilar said Hill came over to her and said they needed to leave. As she was gathering her things to go, she saw Spencer pull out a gun, and run through the entrance of the restaurant while firing several shots. Later, she saw him lying on the ground outside the restaurant, and he appeared to have been shot in the head. She believed the Rollin 20's members had robbed Jones, and Spencer reacted to the robbery because he and Jones were friends.

Hill testified "in exchange for potential consideration" in his own case. He admitted associating with the Rollin 20's. He grew up in the same neighborhood as Brown, and claimed she was also a Rollin 20's associate. He also testified Reynolds, Simon, Hartley, and Kelly were Rollin 20's members, and two other men involved in the robberies, Nicholas Valerio and Dwight Seay, were Rollin 20's associates. Hill identified Brown, Valerio, and Simon from pictures taken from in front of the Boogie nightclub on the night of the shooting. In the picture, Simon was wearing dark clothing and a Pirates baseball cap.

Hill said he and four or five carloads of people from Long Beach decided to go to the Boogie together on the night Jones was killed. After the nightclub closed, Brown, Hill, Simon, Kelly, Reynolds, Valerio, Seay, and Calvin Thomas, all members or associates of the Rollin 20's, decided to go to Denny's and all of them went inside the men's restroom. Simon had a revolver and pointed it at one of the two men in the restroom. Reynolds had a chrome .357-caliber gun, and Kelly had a nine-millimeter.

According to Hill, Simon pointed a gun at Washington's face, while Brown, Reynolds, and Kelly took his property. He saw Brown with Washington's gold chain and cell phone. Valerio and Thomas were in the bathroom stall with Boyd. Hill said one of the victims recognized Kelly and said something. He remembered Reynolds yelling, "20's, cuz."

Hill claimed he walked out of the restroom when Jones walked in. He heard Jones ask, "What the hell is going on?" When Reynolds demanded Jones's gold

5

chain, Jones refused. Jones hit Reynolds after Reynolds forcibly removed the gold chain from around his neck.

When Hill got to the parking lot, he saw Spencer come out of the restaurant, and heard him yell, "Ya'll robbed my homeboys" while waving a gun in the air and then he started shooting. Hill thought Spencer was shooting at him because he had been in the restroom, but he did not actually see where Spencer aimed his gun. Hill hid between two cars as several shots were fired from various locations. When Jones came outside, Hill saw Reynolds fire his .357 handgun at Jones. Jones grabbed his chest and stumbled back inside the Denny's and died.

Hill also saw Kelly fire several shots in Jones's direction. Once the shooting stopped, Hill, Simon, and Kelly fled in the same car. Hill testified Simon looked "all shocked and traumatized." And, he testified Simon said, "I domed that nigga." Hill understood Simon to mean he had shot someone in the head.

Hill admitted knowing that Boyd picked him out of a photographic lineup as one of the three robbers who accosted him in the bathroom stall, but he denied the truth of this accusation. He also denied taking credit for shooting Jones or Spencer. He admitted telling a friend he expected to plead guilty to involuntary manslaughter and receive a six-year sentence as a result of his testimony.

Long Beach Police Detective Sean Magee testified as the prosecution's gang expert. Magee stated the Rollin 20's gang was formed between 1978 and 1981, and their most famous member is the rap star Snoop Dogg. The gang claims an area of east Long Beach as its territory. The members identify with the colors black and yellow or gold, and often wear clothing with the Pittsburgh Steelers or Pirates logo.

As of March 17, 2006, the gang had up to 500 active members, and their primary activities were the commission of murders, robberies, assaults with deadly weapons, and the illegal distribution of narcotics. Magee testified about two crimes committed by other Rollin 20's members, Anthony Wayne Clarke and Tracy Vaughn

6

Paul. Clarke committed murder and attempted murder in December 2005, and Paul had been convicted of murder, possession of a firearm by a felon, and street terrorism for a separate incident in December 2005.

In Magee's expert opinion, Brown, Reynolds, Simon, Valerio, Hill, and Kelly were active participants in the Rollin 20's on March 17, 2006, and the instant crimes were committed for the benefit of, at the direction of, or in association with the gang.

## DISCUSSION

### 1. CALCRIM No. 3500

The prosecutor argued Brown could be held liable for the charged crimes as an actual perpetrator of the robberies, an aider and abettor to the perpetrators, or as part of an uncharged conspiracy. Defense counsel requested the court give a unanimity instruction (CALCRIM No. 3500), arguing, "I think the potential acts that the prosecution may rely on would be the act of going through pockets and taking property or the act of leaving the restroom and returning and giving some sort of warning that Mr. Jones is coming with the necklace. Or even possibly I suppose – none of those acts, but she's present and relying upon the sort of backup theory that the expert testified about yesterday. [¶] So we don't know what actions the jury's going to conclude that Ms. Brown committed, and possibly any of those three types of actions could support a determination that she committed a robbery. So I think the jury has to be instructed [with CALCRIM No. 3500]." The trial judge wrestled with the issue, but ultimately decided to not give the unanimity instruction, stating the "events . . . happened in a confined place within a specific period of time. And I think really it's more an analysis of the theory than an analysis of discrete factual activities in different places at different times."

7

Brown contends the trial court erred by refusing to give the unanimity instruction "because the testimony of the various witnesses was inconsistent and internally conflicting as to what acts [Brown] did that could have been viewed as participation in the robberies." She also argues "there was a sequence of activities constituting, in the prosecution's view, multiple robberies, and the defenses to each were different."

Echoing the prosecutor's closing argument, the Attorney General argues this case involves discrete crimes and the only disagreement the jury could have had was which of the prosecution's theories of culpability applied. We agree.

CALCRIM No. 3500 states in part: "The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed." The instruction is appropriate when conviction on a single count could be based on two or more discrete criminal events, but not where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event. (*People v. Russo* (2001) 25 Cal.4th 1124, 1135 (*Russo*).) When "the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Id.* at p. 1132.)

"In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime." (*Russo, supra,* 25 Cal.4th at p. 1135.) "In the first situation, but not the second, it should give the unanimity instruction." (*Ibid.*) As the *Russo* court stated, "The key to

8

deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed her guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.]" (*Id.* at pp. 1134-1135.)

In this case, Brown was charged with and convicted of two robberies (Washington and Boyd). Substantial evidence proves Brown's involvement in those crimes, although the jury could have found her guilty under any or all of the three theories the prosecution espoused, i.e., as an actual perpetrator in these crimes, as an aider and abettor, or as a member of an uncharged conspiracy. However, there was no evidence any of the people involved in the robberies committed more than one robbery per victim. Consequently, the trial court correctly refused to give CALCRIM No. 3500.

### 2. *CALCRIM No. 240*

Brown argues, "Spencer's unlawful intervention [in the robbery] raises a legal issue whether it was an independent intervening cause of Jones' death that abrogates felony-murder as to appellant, who was not personally involved in the

9

shooting." She contends Spencer's intervention triggered the court's sua sponte duty to instruct the jury with CALCRIM No. 240.[3] Again, we disagree.

In *People v. Cervantes* (2001) 26 Cal.4th 860 (*Cervantes*), the California Supreme Court had occasion to discuss proximate causation in the context of a provocative act murder prosecution. (*Id.* at p. 866.) The high court stated, "'In general, an "independent" intervening cause will absolve a defendant of criminal liability. [Citation.] However, in order to be "independent" the intervening cause must be "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." [Citation.] On the other hand, a "dependent" intervening cause will not relieve the defendant of criminal liability. "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability. [Citation.] '[ ] The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. [ ] The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the

_____

[3] The version of CALCRIM No. 240 in effect at the time of trial provided, "An act [or omission] causes (injury/____ <*insert other description*>) if the injury/____<*insert other description*>) is the direct, natural, and probable consequence of the act [or omission] and the (injury/____ <*Insert other description*>) would not have happened without the act [or omission]. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence. [¶] <*Give if multiple potential causes.*> [¶] [There may be more than one cause of (injury/____<*insert other description*>). An act [or omission] causes (injury/____ <*insert other description*), only if it is a substantial factor in causing the (injury/____<*insert other description*>). A substantial factor is more than a trivial or remote factor. However, it does not have to be the only factor that causes the (injury/____ <*insert other description*>).]"

10

kind which might result from his act.' [Citation.]" [Citation.]' [Citations.]" (*Id*. at p. 871.)

In *Cervantes*, members of different gangs attended the same party. The defendant, a member of the Highland Street gang, shot a member of the Alley Boys gang (Linares) in the arm and chest during a scuffle over a perceived slight to a woman associated with the Alley Boys. (*Cervantes*, *supra*, 26 Cal.4th at pp. 863-864.) A melee erupted with several participants yelling gang challenges. (*Ibid.*) A short time later, a group of Alley boys spotted a lone Highland Street gang member (Cabrera) and fired several shots, killing him. (*Id*. at p. 864.) At trial on charges he killed Cabrera, the defendant testified he did not intend to shoot anyone, and that he was driving away from the party when he heard several shots being fired. (*Ibid.*)

The California Supreme Court reversed the defendant's conviction, observing, "Defendant was not the initial aggressor in the incident that gave rise to the provocative act. There was no direct evidence that Cabrera's unidentified murderers were even present at the scene of the provocative act, i.e., in a position to actually witness defendant shoot Linares. Defendant himself was not present at the scene where Cabrera was fatally gunned down; the only evidence introduced on the point suggests he was already running away from the party or speeding off in his car when the victim was murdered." (*Cervantes*, *supra*, 26 Cal.4th at p. 872, fns. omitted.) The high court further observed, Cabrera's murderers "'intend[ed] to exploit the situation created by [defendant], but [were] not acting in concert with him,' a circumstance that is 'normally held to relieve the first actor [defendant] of criminal responsibility.' [Citations.]" (*Id*. at p. 874.)

Here, unlike *Cervantes,* Spencer took it upon himself to protect his friends during the course of a robbery, but there is no evidence he sought to exploit the situation caused by Brown and her fellow gang members. In fact, Spencer testified he tried to stop Jones from going outside. When he failed to do so and realized Jones was under fire

11

from various areas in the parking lot, he "prayed that [the gun he found] had bullets in it." In our view, Spencer stands in the shoes of a victim of the robbery or a responding police officer, and should not be considered an intervening or superseding cause cutting off Brown's liability for Jones's death. (See *Cervantes*, *supra*, 26 Cal.4th at p. 868; see also *People v. Gilbert* (1965) 63 Cal.2d 690, 704-705 [police officer kills accomplice] reversed on grounds not relevant here *sub nom. Gilbert v. California* (1967) 388 U.S. 263.)

Under established principles of causation, "[t]he defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act. [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 847.) A shooting death during a gang-related armed robbery like this is a reasonably foreseeable risk, not an extraordinary or abnormal occurrence. By way of contrast, if an airplane had fallen from the sky and killed Jones, Brown's argument would have merit. But here we see no reason for absolution simply because the victims' friend intervened as opposed to one of the victims himself or a responding peace officer.

The evidence shows Brown participated in two armed robberies in which more than one perpetrator possessed a gun. The crimes took place in a busy restaurant. Although a bystander's violent intervention was not inevitable, Spencer's involvement in the robbery is hardly the type of occurrence so remote and unusual that it would cut off the criminal liability of one of the robbery participants. "[I]t is impossible to see how it could reasonably be concluded that the death[] of [Jones] in such circumstances could have been an unnatural or improbable consequence of appellants' admitted acts." (*People v. Anderson* (1991) 233 Cal.App.3d 1646, 1662.)

Brown also argues Spencer's acts were not legally justifiable, and she "cannot be liable for the robbers' reaction to Spencer's independent, illegal, and lethal conduct." She has cited no authority for the proposition an intervening act cuts off

12

liability unless the intervening act is both foreseeable *and* legally justifiable. Furthermore, we are not prepared to find on this record that his acts fall outside of section 197's provision for justifiable homicide when the life of another is threatened, or as a justified act to apprehend those who had just robbed his friend. (See § 197, subds. (1), (4).)

Finally, as Brown concedes, the court gave CALCRIM No. 540B, which required the jury to find, among other things, a "logical connection" between the cause of Jones's death and the robbery, and that the connection between the robbery and murder was more than just their occurrence at the same "time and place." (See *People v. Cavitt* (2004) 33 Cal.4th 187, 201 [to satisfy the "complicity aspect" of the felony-murder rule, a nonkiller is responsible for a homicide committed by a cofelon when there is "a logical nexus, beyond mere coincidence of time and place, between the felony the parties were committing or attempting to commit and the act resulting in death"].) And, as the Attorney General notes, the trial court also gave CALCRIM Nos. 549 and 730, which informed the jury Brown could be convicted of felony murder only if it determined the act causing Jones's death and the robberies were part of one continuous transaction. Thus, there was no sua sponte obligation to instruct the jury with CALCRIM No. 240.

*3. Cruel and Unusual Punishment*

Brown filed a posttrial motion to reduce the LWOP sentence on grounds of cruel and unusual punishment in violation of both the California Constitution and the Eighth Amendment of the United States Constitution. At sentencing, the trial court ruled

13

Penal Code section 1385.1[4] precluded striking the special circumstance or otherwise reducing the LWOP sentence, but did not rule on the merits of Brown's constitutional claim, apparently believing no published case affirmed this authority after the enactment of section 1385.1. But the trial court expressed concern that an LWOP sentence in this case could be unconstitutional as applied to Brown because she was not armed with a firearm, nor did she personally use a firearm, and it did not appear she took a leadership role in the crimes.

On appeal, Brown asserts the trial court did have discretion to reduce her sentence under state and federal constitutional provisions against the infliction of cruel and unusual punishment. The Attorney General concedes the court erred by concluding it lacked discretion to reduce her sentence under these constitutional provisions, and we agree with this concession. The Attorney General argues remand is not required because an application of constitutional principles outlined in *People v. Dillon* (1983) 34 Cal.3d 441, 479 would yield no different result. We disagree.

The court had access to the probation report, which mentioned Brown's relative youth at the time of the crime (23 years old), minimal criminal record, and factors in her background that suggested leniency could be appropriate in her case. The court was familiar with the facts of the case, which demonstrated Brown's non-leadership role in the crimes and proved she neither personally possessed nor used a firearm. The trial court also stated if the matter is remanded for a new sentencing hearing there were other facts to be considered. We agree these facts could be important to the trial court's resolution of the constitutional claim. Therefore, we remand the case for a new

---

[4] "[Penal code s]ection 1385 generally authorizes a judge to order an action dismissed in furtherance of justice. (§ 1385, subd. (a).) However, section 1385.1 provides: 'Notwithstanding Section 1385 or any other provision of law, a judge shall not strike or dismiss any special circumstance which . . . is found by a jury or court as provided in Sections 190.1 to 190.5, inclusive.' In light of section 1385.1, the court had no authority to strike the . . . special circumstance. [Citations.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1075.)

14

sentencing hearing to allow the trial court to consider exercising its sentencing discretion in the first instance.

## DISPOSITION

The judgment is reversed only as to the sentence imposed and the matter is remanded for a new sentencing hearing.  In all other respects, the judgment is affirmed.


THOMPSON, J.

WE CONCUR:


ARONSON, ACTING P. J.


IKOLA, J.


15