Filed 4/3/14  P. v. Carpenter CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>      v.<br><br>PAUL EDMOND CARPENTER,<br><br>          Defendant and Appellant. | B246004<br><br>(Los Angeles County<br> Super. Ct. No. SA034468) |

APPEAL from the judgment of the Superior Court of Los Angeles County. Katherine Mader, Judge.  Affirmed as modified.

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

This appeal arises from the attempted robbery of four German tourists near the beach in Santa Monica in October 1998, in which one of the tourists was fatally shot. Three suspects were arrested, charged and convicted shortly thereafter. Based on the investigation by the Santa Monica Police Department and statements from two of the suspects, defendant and appellant Paul Edmond Carpenter was considered a fourth suspect in the crimes. In 2009, a fugitive task force of the Federal Bureau of Investigation (FBI) located defendant living and working, under an assumed name, in Jamaica. Defendant was returned to the United States and charged with three counts of attempted robbery and one count of murder. The murder charge included a robbery murder special circumstance allegation.

In 2011, a jury convicted defendant as charged. Defendant was sentenced to a state prison term of 25 years to life, plus 7 years. Defendant raises multiple issues on appeal: (1) the trial court erroneously denied his two *Wheeler*/*Batson*[1] motions; (2) the jury's verdicts as to the attempted robbery and murder of Horst Fietze and the attempted robbery of Gisela Ulber are not supported by substantial evidence; and (3) the jury was instructed with incomplete and misleading instructions on aiding and abetting liability and the felony murder rule as it applies to nonkiller accomplice liability.

Respondent argues there was no error and that defendant's conviction on all four counts should be affirmed. However, respondent urges this court to modify defendant's sentence, in part, by ordering the sentence to be stayed on the attempted robbery count involving the murder victim. Respondent contends the imposition of sentence on both the predicate felony of attempted robbery and on the felony murder count is improper. Respondent also contends we should order the sentences on the attempted robbery counts involving the other two victims to be served consecutively and not concurrently. In the alternative, respondent requests a limited remand for resentencing. Defendant did not

---

[1]    *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), overruled in part by *Johnson v. California* (2005) 545 U.S. 162 (*Johnson*), and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).

raise the sentencing errors on appeal, but in his reply brief, he essentially joins in respondent's arguments.

We conclude the judgment of conviction is properly affirmed as to all four counts. As to defendant's sentence, we agree the sentence on the attempted robbery of Mr. Fietze should have been vacated or stayed, and the sentences on the attempted robberies of Mrs. Ulber and her husband, Jergen Ulber, should have been consecutive sentences. We therefore modify the sentence accordingly and direct the superior court to prepare a modified abstract of judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In the fall of 1998, Mr. and Mrs. Ulber traveled to the United States from their home in Germany, with their friends, Astrid and Horst Fietze. On the evening of October 12, 1998, the four friends were walking near the beach in Santa Monica, headed back to their hotel. As they walked along the sidewalk, Mrs. Ulber and her husband were slightly ahead of Mr. and Mrs. Fietze. Mrs. Ulber turned back to say something to Mr. Fietze. As she did so, she noticed a car following behind them with no headlights on. The car stopped and three young people, two males and one female, got out of the car and ran towards the two couples. Mrs. Ulber said, "Now there's going to be problems."

The female approached Mrs. Ulber and grabbed her wrists, pushing her toward a hedge. One of the males approached her husband, and the other approached Mr. Fietze. In English, Mrs. Ulber told the female, "No Dollar, Germany." The female turned to the male who had Mr. Fietze and said something to him that Mrs. Ulber did not understand. Her husband had been pushed away from the group a bit by the male who confronted him. Mrs. Ulber then heard a gunshot, followed by several more shots. One of the males and the female ran back to the car and jumped in. The car moved down the road a bit toward the other male and stopped for him to jump in. The car then drove off.

Mrs. Ulber saw Mr. Fietze lying on the sidewalk, bleeding. She, her husband and Mrs. Fietze started screaming. A man with a cell phone appeared fairly quickly and called the police. Emergency personnel arrived and took Mr. Fietze to the hospital, where he died of his wounds.

## 1.    The Investigation and Charges

Detective John Henry of the Santa Monica Police Department, a veteran homicide detective, was assigned to investigate the murder and attempted robberies.  Detective Henry interviewed the surviving victims and numerous witnesses, obtained surveillance video from a nearby hotel showing a vehicle leaving the scene, and pursued various leads.  Within several months of the incident, Lamont Santos, Tyrina Griffin and Roshana Roberts were arrested and charged with the attempted robbery and murder of Mr. Fietze, as well as the attempted robberies of Mr. and Mrs. Ulber.

Detective Henry interviewed Roberts and Griffin several times, including taking Griffin to the crime scene behind the Loews Hotel along Appian Way.  He, along with his partner, questioned Griffin in a tape-recorded interview.  In their respective statements, both Roberts and Griffin implicated themselves, as well as Santos, and identified defendant as a fourth participant in the crimes.  In a joint court trial, Santos, Griffin and Roberts were convicted and sentenced to state prison.

In 2009, Scott Garriola, an agent overseeing the FBI fugitive task force, located defendant, living and working under an assumed name (Jermaine Thomas), in Jamaica.  Agent Garriola flew to Jamaica, arrested defendant and transported him back to the United States.  During the time defendant was in Agent Garriola's custody, defendant initiated two conversations.  In the first, he asked Agent Garriola what crimes he was being charged with, and Agent Garriola responded murder and robbery.  Defendant said, "Well, I'm not guilty of most of that."  In the second conversation, which took place on the plane trip back to the United States, defendant asked Agent Garriola if he was facing the death penalty.  Agent Garriola told him he was not aware of that.  Agent Garriola then asked defendant if he was the shooter or was he just there.  Defendant responded he "was just there."  Detective Henry took custody of defendant upon his arrival at Los Angeles International Airport.

4

Defendant was charged by information with four counts: (1) first degree murder of Mr. Fietze (Pen. Code, § 187, subd. (a); count 5)[2]; (2) attempted second degree robbery of Mr. Fietze (§§ 211, 664; count 6); (3) attempted second degree robbery of Mr. Ulber (§§ 211, 664; count 7); and (4) attempted second degree robbery of Mrs. Ulber (§§ 211, 664; count 8). A robbery murder special circumstance allegation was alleged as to count 5. (§ 190.2, subd. (a)(17).) It was also specially alleged as to all four counts that a principal used a firearm in the commission of each offense. (§ 12022, subd. (a)(1).) Defendant pled not guilty to all charges and denied the special allegations.

2.      **Jury Selection**

The case proceeded to a jury trial in October 2011. Before starting jury selection, the court explained that it would conduct voir dire, but that counsel would each be entitled to ask some additional questions of the jurors, and counsel could also opt to give a mini-opening. The court asked counsel about any supplemental questions they wanted to discuss being added to the court's list of questions. Counsel agreed the court should ask the prospective jurors about any experiences with substance abuse and connections to Germany, and the court agreed to make such inquiries.

On the third day of voir dire, two prospective jurors were called to sit in the open seats vacated by recently excused prospective jurors. Juror No. 5478 was asked to take seat No. 4 (becoming Juror No. 4), and Juror No. 2606 was asked to take seat No. 14 (becoming Juror No. 14). Both jurors responded to the general background questions asked by the court, as well as the additional questions on agreed-upon topics such as any familiarity with firearms. Several other prospective jurors also answered the general questions. The court then turned questioning over to defense counsel.

Defense counsel asked Juror No. 13: "You heard [the prosecutor's] questions about the felony murder rule. Can you give us your opinion about that?"

---

**2**      All further undesignated section references are to the Penal Code. Defendant was charged with only the four counts numbered 5 through 8; counts 1 through 4 had been pled against his co-accomplices in the earlier trial.

5

Juror No. 13 responded: "I've been actually struggling all afternoon with that. In all other aspects of this case, with everything that I've heard and everything that's been discussed, I feel that I could be objective to the evidence that's presented regarding the crime. [¶] But I've really been struggling with that in that if—if I was on the jury and it came to the point where—where I was convinced that the defendant was guilty beyond a reasonable doubt of the robbery, that if this law obligates me to then determine him guilty of murder . [¶] . . . [¶] . . . First degree murder. I'm having a very hard time with that."

Asked to elaborate, Juror No. 13 reiterated she felt concerned about being obligated to find someone guilty of murder if he or she had not pulled the trigger and said, "when it came down to it, I don't think that I could sit with my own conscience in following that law."

Defense counsel then asked Juror No. 14, "is your opinion any different from Juror No. 13?" Juror No. 14 said: "Mine is pretty much the same. I believe that you have to listen to all the evidence that is presented to you and decide your, you know, ultimate answer for your individual, you know—it would be my individual pen as to what, you know, was presented, and if it's correct or not correct. And, you know, as far as that person not being actually part of pulling the trigger, as she said, I don't know if I could find that person is guilty."

Defense counsel asked a few more follow-up questions to several more prospective jurors and then the prosecutor proceeded with his questions. The prosecutor returned to Juror No. 13 and made further inquiries on the felony murder rule. Juror No. 13 professed respect for the law generally but restated her concerns about following that rule. The prosecutor then said, "In other words, you would have to follow your own personal conscience as opposed to the law?" Juror No. 13 responded, "Right."

The prosecutor thanked Juror No. 13 for her candor and then asked some follow-up questions to Jurors No. 9 and 18. Both jurors expressed reservations about the felony murder rule, but both stated they believed they could follow the law. The prosecutor did not ask follow-up questions of Juror No. 14.

6

In a sidebar discussion, the prosecutor raised challenges for cause to Jurors No. 13 and 14. The court stated Juror No. 13 basically said she could not follow the law. Defense counsel did not argue. The court granted the prosecutor's challenge to Juror No. 13. The court continued, saying "I didn't feel [Juror No. 14] was as strong." The prosecutor agreed, but said that Juror No. 14 nonetheless indicated she would have trouble following the law relative to the felony murder rule. The court denied the prosecutor's for-cause challenge to Juror No. 14.

The next court day, after several more peremptory challenges were exercised by the prosecution and the defense, Juror No. 14 moved into seat No. 2.[3] The prosecutor then sought to exercise a peremptory challenge to Juror No. 14. Defense counsel asked for a sidebar. Out of the presence of the jury, defense counsel made his first *Wheeler*/*Batson* motion, stating his belief the prosecutor was improperly excusing African-American jurors, particularly African-American women.

The court stated that, thus far, the prosecutor had excused seven Caucasian jurors (six female), one Hispanic female juror, and five African-American jurors (three female). The court stated that its notes reflected that Juror No. 14 had expressed doubts about the felony murder rule. The court then said: "I don't really find a case of a pattern of excusing female African-Americans. But if you would like to – I mean, since we're here, Mr. Grace [(prosecutor)], if you want to say something."

The prosecutor responded: "Your Honor, as you recall, this is the juror who I challenged for cause regarding the felony murder rule. She expressed her displeasure as to the felony murder rule and said she wasn't sure if she could follow that rule. The court denied our challenge. But we just do not think that she will follow the felony murder rule."

The court denied the motion, stating "I don't find this to be in any way race related."

---

**3** For the sake of clarity, we maintain the prospective juror's designation as Juror No. 14.

Later on, the prosecutor sought to exercise his 17th peremptory challenge to Juror No. 4. Defense counsel again asked to approach and raised his second *Wheeler/Batson* motion. Defense counsel stated the "prosecution appears to be excluding Blacks, particularly Black females. [¶] . . . [¶] . . . This particular juror doesn't appear to have had a problem with the felony murder rule. She did have prior jury experience. She's an RN. She said nothing to indicate that she would be prejudice[d] one way or the other towards the defense or the prosecution. [¶] I don't believe that there is a legitimate reason for excusing her at this time." The court turned to the prosecutor and invited his comment. The following colloquy occurred:

"[THE PROSECUTOR]: . . . This particular [juror] is a nurse. I've already got one, Juror No. 1.

"THE COURT: Who is a Black female.

"[THE PROSECUTOR]: Black female, who is also a nurse. And I like Juror No. 13 better who is going to go into that spot, who is also African-American.

"THE COURT: Female.

"[THE PROSECUTOR]: Right. So I'm trying not to—I'm trying to have a balance of people. And I like—who is going to be ultimately the next Juror No. 4 better than I do this particular juror.

"THE COURT: Okay. I don't find that to be a distinction based upon race. I think it's a race neutral justification. I'm going to deny the challenge."

Voir dire was completed and the jury was sworn. The court recited the racial composition of the jury on the record in light of defendant's *Wheeler/Batson* motions: "one male African-American, two female African-Americans, one woman who is either African-American or possibly Hispanic, two male white, three female white, one male Hispanic, two female Asians. And our alternates, one female African-American and two female Hispanic."

### 3.    Trial Testimony

Mrs. Ulber testified to the facts surrounding the incident of October 12, 1998, set forth at the outset of the factual summary above. She further testified the female assailant

8

who grabbed her wrists did not speak to her and did not attempt to reach into her pockets. Mrs. Ulber said she was not carrying a purse at the time, so no property was taken from her. She explained she was unable to identify any of the individuals who accosted them, but that all three of them had been "dark-skinned." The one who struggled with her husband was lighter-skinned than the other two.

Mr. Ulber testified consistently with his wife regarding the events leading up to the incident. However, unlike his wife, he did not see the car approach. His attention was drawn by the sound of an unfamiliar woman's voice behind him. He did not understand what she said. Mr. Ulber turned around and a male grabbed him almost immediately. He held Mr. Ulber tightly around the shoulders and waist. Mr. Ulber struggled with the male who was holding him, so the man's arms were at different places on his body, from his waist up to his shoulders. He could not recall the male saying anything to him during the struggle, or reaching into his pockets, and no property was ultimately taken from him.

As Mr. Ulber struggled with the male who had grabbed him, he noticed another male with Mr. Fietze. That man appeared to have a pistol in his hand. Mr. Ulber heard gunshots and the man holding him let go at some point. His attention was then drawn to the sight of his friend lying on the ground, bleeding. He, his wife and Mrs. Fietze began yelling for help. Several people came out, the police were called and Mr. Fietze was taken to the hospital. Mr. Ulber testified the people who attacked them were "dark skinned."

Mrs. Fietze's testimony was substantially consistent with the testimony of Mr. and Mrs. Ulber. Mrs. Fietze recalled that while they were walking along the sidewalk, going back to their hotel, Mrs. Ulber turned around and said something like "[t]here's going to be trouble." Three people came up behind them, one of the men touched her briefly but then moved on to Mr. Ulber and pinned him with his arms. Another man, who she believed had a pistol, approached her husband. Everything happened very quickly. She heard gunshots and then the three assailants ran off, got into a car and drove away.

Mrs. Ulber saw her husband collapse to the sidewalk. She was taken to the hospital where he was being treated and was told by the doctors they were unable to save him.

Aion Velie lived in an apartment building just north of the Loews Hotel. Sometime after 9:00 p.m., Mr. Velie arrived home from work, parked his car in the lot near the beach and started to walk to his apartment. He noticed a car, with its headlights off, parked or idling in the center of Appian Way, which seemed odd to him. At least two youths got out of the car and started heading in his general direction, crossing the street at an angle. One of them was wearing a hooded jacket. He appeared to be a black male, 17 or 18 years old, about 5 feet 11 inches tall with a thin build. Mr. Velie was carrying a new notebook computer and he had a sense something was wrong or dangerous about the youths' conduct, so he turned back to his car. After briefly getting back into his car, he noticed the youths had continued down Appian Way in the direction of the Loews Hotel, and had approached a group of four white adults that appeared to be two couples.

Mr. Velie decided it was safe to start back to his apartment. As he approached the buildings on the east side of Appian Way, where the stairwell was to his apartment, he looked back at the group of people on the sidewalk. He saw that the youths had confronted the four adults, and appeared to be struggling with them. One of the white males fell backward off the sidewalk onto the street. As he got back up, Mr. Velie heard what sounded like a gunshot. He ducked behind the building and called 911. He heard additional shots in rapid succession.

While still on the phone with the 911 operator, Mr. Velie peeked around the side of the building. He saw the vehicle that had been in the center of the street had pulled up parallel to where the struggle had ensued on the sidewalk. He saw at least two youths jump back into the car, and the car proceed down Appian Way towards Pico Boulevard. Mr. Velie then heard a woman start to scream.

At about the same time as Mr. Velie was arriving home from work, Deborah Nellis was in her apartment which had a kitchen with large windows that looked out onto Appian Way near the Loews Hotel. Ms. Nellis was looking out those windows and saw a

10

group, maybe two couples, casually walking down Appian Way and chatting. She then saw a car driving very slowly down Appian Way, approaching the couples from behind. After the two couples and the car moved out of her line of sight, Ms. Nellis heard some sort of a commotion, and then heard a series of loud popping noises. She then saw a woman walking back and forth and screaming. She appeared to be asking for help. Ms. Nellis was frightened and thought the loud noises may have been gunshots, so she called 911.

Kirk Arnold who lived nearby also heard a commotion, and then gunshots, one followed by a series of three. He was familiar with guns and thought it sounded like a small caliber weapon. He looked out his window with a view of Appian Way. Mr. Arnold saw a male holding a handgun, slightly crouched and backing toward a car that had pulled up near the sidewalk. The car was facing southbound in the northbound lane. He kept backing toward the car and then got into the driver's side, and the car drove off. Mr. Arnold called 911 and then went down to see if he could help.

Leslie Wickman testified she and her friend, Ashley Regmer, had finished playing volleyball on the beach and were chatting near where Ms. Regmer's car was parked along the street behind the Loews Hotel. Ms. Wickman heard a commotion and loud angry voices coming from across the street. As she turned toward the sound of voices, she saw a group of people. One of the men, who was African-American, pulled a gun and shot a Caucasian man standing right in front of him. She was close enough to see "sparks" or muzzle flash. She and Ms. Regmer ran back to the beach and called 911. Ms. Regmer testified substantially consistently with Ms. Wickman about what the two women witnessed.

Detective Henry testified to the facts set forth above regarding the investigation and arrest of Griffin, Roberts and Santos. Detective Henry also explained how they obtained a lead on a suspect vehicle from the surveillance video recovered from a nearby hotel. They recovered the suspect vehicle, which had been stolen the day before the incident, and it contained the fingerprints of both Roberts and Griffin. He elaborated on the statements made by Griffin and Roberts implicating themselves, as well as Santos and

11

defendant in the crimes. Detective Henry further testified to his tape-recorded interview of Griffin at the crime scene, including that she accurately pointed out where the incident took place, told him defendant and Santos had been seated in the back seat of the car on the way to the beach, and that both Santos and defendant asked the two male victims for money. The recording of the interview was played for the jury, and a transcript was admitted into evidence.

Griffin, who was still serving her sentence at the time she testified, said she was 17 or 18 years old in 1998. She was acquainted with Roberts, but could not specifically recall how they met. On the night of October 12, 1998, she, Roberts, defendant (whom she met through Roberts), and Santos drove to a park in Santa Monica. Roberts drove them in a bluish-gray Toyota that Griffin said she had stolen sometime before. Griffin recalled she had been drinking and smoking marijuana, but did not recall if the others drank or smoked that night. Griffin testified they all discussed committing a robbery, then got back into the car and Roberts drove toward the beach.[4]

Griffin said they were driving along somewhere near the pier in Santa Monica and saw a group of four white people walking on the sidewalk. Roberts stopped the car and she (Griffin), Santos and defendant got out to rob them. Griffin saw that Santos had a gun, which he had been discussing with defendant in the car on the drive over.[5] They approached the two couples and Griffin grabbed one of the women by her hands or wrists. She said she did not recall telling Detective Henry that Santos approached Mr. Fietze, while defendant grabbed Mr. Ulber. Griffin admitted she identified Santos as

---

[4] At trial, Griffin admitted she and Roberts talked about committing a robbery, but said she did not recall her preliminary hearing testimony where she admitted all four of them discussed it together. Her preliminary hearing testimony was read into the record.

[5] Griffin testified she did not remember when she first saw the gun, then said she knew Santos had it only after she heard the shots, and made additional inconsistent statements regarding her knowledge of the gun. Her preliminary hearing testimony stating the gun was discussed in the car on the way to the beach was read into the record.

12

the shooter, but only after one of the detectives told her that Santos had already admitted it. Griffin said that after she heard the gunshots, she ran back to the car.

Roberts, who was on parole at the time of trial, also testified. She identified defendant in court, and Griffin and Santos from photographs. In October 1998, she and defendant were dating. Roberts testified that on the evening of October 12, 1998, the four of them drove to a park in Santa Monica where they sat around drinking and smoking marijuana.

Roberts said they then left the park and headed toward the beach. She admitted they had been discussing committing a robbery but claimed she thought Santos was joking. Someone told her to stop the car, so she did, and defendant, Griffin and Santos got out of the car. They walked toward four white people walking along the sidewalk. Roberts initially expressed difficulty remembering certain details as to how the incident unfolded, but eventually admitted to the facts she reported to Detective Henry after her arrest. Roberts admitted she told him that after the three confronted the two couples, she heard a gunshot. Defendant and Griffin then ran back to the car and urged her to drive away. She started to drive and Santos appeared in front of the car, holding a gun. She recalled Santos looked angry or panicky that they were leaving without him. Roberts stopped the car, Santos jumped in and they drove back to South Los Angeles. After the incident, Roberts said she left Los Angeles and moved in with her father in Enid, Oklahoma, where she was eventually arrested.

Agent Garriola testified to the facts set forth above concerning his work, and the work of the FBI fugitive task force, in locating defendant in Jamaica in 2009. He attested to the two conversations initiated by defendant in which defendant admitted being at the scene, but claimed he was not responsible for most of what happened.

Nashema Newell testified about the arrest of defendant in Jamaica. Officer Newell is a police officer with the Jamaican Constable Force who works organized crime and is attached to the fugitive apprehension team. Officer Newell said defendant, at the time of his arrest, held forged identification documents showing his name to be Jermaine Thomas. She was present when defendant was visited at the jail by one of his employers,

13

Marjorie Borough. Defendant apologized to his employer for any embarrassment caused to the company. He admitted his name was Paul Carpenter and that he was the person in the wanted poster. Defendant denied shooting anyone but admitted being at the scene. Ms. Borough testified substantially consistently with Ms. Newell about defendant's statements. She said he denied shooting anyone but admitted being "involved." She did not ask him to clarify what that meant.

### 4. The Verdict and Sentencing

The jury convicted defendant of the first degree murder of Mr. Fietze, as charged in count 5. The jury also found true the robbery murder special circumstance allegation pursuant to section 190.2, subdivision (a)(17), and the allegation that a principal used a firearm in the commission of the offense within the meaning of section 12022, subdivision (a)(1). The jury further convicted defendant of all three attempted robberies as charged in counts 6, 7, and 8, and found true the firearm allegation as to each of those offenses.

At sentencing, the prosecution stated its intention not to seek the death penalty, and moved the court to dismiss the special circumstance allegation. The court granted the prosecution's motion. Defendant was sentenced to an aggregate state prison term of 25 years to life, plus 7 years, calculated as follows: a 25 years-to-life term on count 5, the base count (murder of Mr. Fietze), plus 1 year for the firearm enhancement; a consecutive term of 6 years on count 6 (attempted robbery of Mr. Fietze), consisting of the upper term of 5 years plus 1 year for the firearm enhancement; and concurrent terms of 1 year 4 months on each of counts 7 and 8 (attempted robberies of Mr. and Mrs. Ulber), consisting of one-third the midterm on both the offenses and firearm enhancements. Defendant was awarded 1,422 days of custody credits, and ordered to pay various fines and fees.

This appeal followed.

14

## 1.    The *Wheeler*/*Batson* Motions

Defendant, who is African-American, contends the trial court erroneously denied his two *Wheeler*/*Batson* motions based on the prosecution excusing two African-American jurors. Defendant argues his federal and state constitutional rights were violated which compels a reversal of his conviction. We are not persuaded.

A prosecutor's use of a peremptory challenge to strike a prospective juror on the sole ground of group bias, such as race, violates a defendant's rights to equal protection and to trial by jury by a representative cross-section of the community under the United States Constitution and California Constitution, respectively. (*Batson*, *supra*, 476 U.S. at p. 84; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.) The three-step inquiry for reviewing a defendant's *Wheeler*/*Batson* motion is well established. "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (*People v. Taylor* (2009) 47 Cal.4th 850, 885-886 (*Taylor*); accord, *Johnson*, *supra,* 545 U.S. at p. 168.)

With respect to his first motion (concerning Juror No. 14), defendant argues the trial court impliedly found he had established a prima facie case by asking the prosecutor to state his reasons for the challenge of Juror No. 14, but applied the wrong standard in evaluating his motion. Defendant contends the court's statements reflect the court believed he was required to show a pattern of discrimination when he was only required to show the challenge was race-based, and that comparative juror analysis demonstrated the sham nature of the prosecutor's proffered race-neutral justification. We do not agree.

The grounds for defendant's motion merely consisted of the assertion, without any detailed argument, of counsel's belief the prosecutor was seeking to excuse female African-American jurors. The court responded by reviewing its notes and identifying the

mixed racial composition of the prospective jurors the prosecutor had excused with his first 13 peremptory challenges. The court also stated that Juror No. 14 had expressed concerns about the felony murder rule. The court then made the following statement: "I don't really find a case of a pattern of excusing female African-Americans. But if you would like to – I mean, since we're here, Mr. Grace [(prosecutor)], if you want to say something."

Defendant is correct that a defendant's prima facie burden under step one does not require the demonstration of a pattern or practice of discriminatory excusals. (*Johnson*, *supra*, 545 U.S. at p. 169, fn. 5.) However, a review of the the court's statements in context does not support a finding the court was requiring such a showing from defendant, nor does it support defendant's assertion the court impliedly found that he had sustained his prima facie burden. "[A] trial court's request that the prosecutor provide reasons for his or her exercise of a peremptory challenge is not an implicit finding the defendant has established a prima facie case, and does not moot the issue, in every instance. 'In determining whether to infer a trial court's finding of a prima facie case under *Wheeler*, we look to the whole record, examining the court's remarks in context.' [Citation.]" (*People v. Taylor* (2010) 48 Cal.4th 574, 612.)

The court's statements are reasonably interpreted as an effort to explain why defendant had failed to make a prima facie showing. Pointing to the fact the prosecutor's exercise of peremptory challenges up to that point revealed no apparent pattern to remove jurors based on race was reasonable, given defense counsel's failure to articulate any argument raising an inference of racial bias, other than counsel's belief the prosecutor was so motivated. And, the court's invitation to the prosecutor to state the reasons for his challenge was only an invitation to make a record. Our Supreme Court has explained that requesting a prosecutor to make a record is the "better practice," even when the step one prima facie showing by defendant has not been satisfied. (*People v. Bonilla* (2007) 41 Cal.4th 313, 343, fn. 13 ["it is the better practice for the trial court to have the prosecution put on the record its race-neutral explanation for any contested peremptory challenge, even when the trial court may ultimately conclude no prima facie case has

16

been made out. This may assist the trial court in evaluating the challenge and will certainly assist reviewing courts in fairly assessing whether any constitutional violation has been established"]; accord, *People v. Taylor*, *supra*, 48 Cal.4th at p. 614, fn. 9.)

Because the record supports a finding the trial court impliedly found defendant did *not* satisfy his burden to show a prima facie case, our only task is to independently review the record "to decide 'the legal question whether the record supports an inference that the prosecutor excused a juror on the basis of race.' [Citation.]" (*People v. Taylor*, *supra*, 48 Cal.4th at p. 614.) The prosecutor responded to the court's invitation to make a record by saying: "Your Honor, as you recall, this is the juror who I challenged for cause regarding the felony murder rule. She expressed her displeasure as to the felony murder rule and said she wasn't sure if she could follow that rule. The court denied our challenge. But we just do not think that she will follow the felony murder rule."

The colloquy from the preceding day of voir dire, when the prosecutor unsuccessfully sought to excuse Juror No. 14 for cause, substantiates the credibility of the prosecutor's stated reasons for exercising a peremptory challenge to remove her. In particular, Juror No. 14 stated her beliefs were "pretty much the same" as Juror No. 13 who had said she would likely follow her own conscience rather than the law as it applied to the felony murder rule. Juror No. 14 underscored that point by stating, "[a]nd, you know, as far as that person not being actually part of pulling the trigger, as she said, I don't know if I could find that person is guilty." Those comments, combined with defendant's meager showing, and the record revealing no pattern of discriminatory excusals by the prosecutor in exercising his first 13 peremptory challenges, more than dispels any concern Juror No. 14 was excused on account of her race. We agree with the trial court that the prosecutor's peremptory challenge to Juror No. 14 does not appear "to be in any way race related."

As for defendant's second motion (the excusal of Juror No. 4), defendant argues the court conflated the second and third steps of the *Wheeler/Batson* inquiry, and in so doing, failed to make a sincere and reasoned effort to evaluate the prosecutor's stated bases for the peremptory challenge. Once again, we do not agree.

17

Defense counsel articulated a more detailed prima facie case in the second motion. He noted his concerns that another black female juror was being excused, even though she did not state any problems with the felony murder rule, she had prior jury experience, and was an educated person employed as a nurse. Counsel also argued that Juror No. 4 had not given any indication in her responses that she was biased in favor of the prosecution or the defense. Once again, the court did not specifically make any finding as to defendant's prima facie case at that time, but just turned to the prosecutor and invited his comment.

The prosecutor stated that Juror No. 1 was also a black female nurse. He explained he liked "Juror No. 13 better who is going to go into that spot, who is also African-American." And Juror No. 13 was also female. "I'm trying to have a balance of people. And I like—who is going to be ultimately the next Juror No. 4 better than I do this particular juror."

The court responded: "Okay. I don't find that to be a distinction based upon race. I think it's a race neutral justification. I'm going to deny the challenge."

Viewing the entirety of the statements of the court and counsel, it appears the court impliedly found defendant did state a prima facie case as to the challenge of Juror No. 4, which shifted the burden to the prosecutor, and the court found the stated justification for the challenge to be race-neutral.

" 'At the third stage of the *Wheeler/Batson* inquiry, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her.' [Citation.]" (*People v. Jones* (2011) 51 Cal.4th 346, 360 (*Jones*).)

18

Our review of the court's third-step finding of a race-neutral justification for the prosecutor's challenge to Juror No. 4 is deferential. We look only for substantial evidence supporting the trial court's conclusions. (*Jones*, *supra*, 51 Cal.4th at pp. 360-361.) " 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." ' [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" ' [Citation.]" (*Id*. at p. 361.)

Defendant contends the record shows the court failed to make a "sincere and reasoned effort" to evaluate the prosecutor's reasons, and merely accepted the justifications as credible without discussion. We disagree. The record contains ample support for the trial court's denial of defendant's motion. " 'There is more to human communication than mere linguistic content. On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact.' [Citation.]" (*Jones*, *supra*, 51 Cal.4th at p. 363.)

The prosecutor articulated multiple, permissible, race-neutral reasons for seeking to remove Juror No. 4. He said he was attempting to achieve a balance of backgrounds on the jury, and simply felt better about the prospective juror who was going to move into Juror No. 4's spot upon her excusal. Defendant's contention this was a pretextual argument because the prosecutor accepted another nurse is not persuasive. We do not find comparative juror analysis useful in this instance. As our Supreme Court cautioned, " 'comparative juror analysis on a cold appellate record has inherent limitations.' [Citation.] In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved. 'Two panelists might give

19

a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding.' [Citation.]" (*Taylor*, *supra*, 47 Cal.4th at p. 887.)

The trial court observed the prospective jurors' answers to voir dire and listened to both defense counsel and the prosecutor's explanations regarding Juror No. 4. The court was aware of how the prosecutor had exercised his peremptory challenges up to that point. Nothing in the record indicates the court was unaware of its obligations under step three of the *Wheeler*/*Batson* inquiry. The trial court was not required to articulate a lengthy explanation for denying defendant's motion. (*Jones*, *supra*, 51 Cal.4th at p. 361; see also *People v. Hamilton* (2009) 45 Cal.4th 863, 901 [" 'trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine' "].)

## 2. Substantial Evidence Supports the Convictions on Counts 5, 6 and 8

Defendant contends the jury's verdicts convicting him of the murder and attempted robbery of Mr. Fietze and of the attempted robbery of Mrs. Ulber are not supported by substantial evidence. We do not agree.

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence--that is, evidence that is reasonable, credible, and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) "We ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 509.) And, " '[a]lthough we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination

depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

Defendant does not challenge the sufficiency of the evidence in support of count 7 pertaining to the attempted robbery of Mr. Ulber. There is substantial evidence in the record supporting that defendant was the individual who accosted Mr. Ulber. However, defendant contends the record lacks substantial evidence he aided and abetted the attempted robbery of Mrs. Ulber and the attempted robbery and murder of Mr. Fietze. Defendant relies in large part on *People v. Stankewitz* (1990) 51 Cal.3d 72, 90, for the proposition that mere presence at the scene of a crime or failure to prevent its commission is insufficient to support aiding and abetting liability.

That principle, while an accurate statement of the law, does not apply to the record in this case. There is ample and solid evidence in the record supporting the jury's determination the three attempted robberies and the one resulting murder were a planned, coordinated and simultaneous attack on the victims in which defendant directly participated. Substantial evidence demonstrates that all four accomplices discussed and agreed to commit a robbery on the drive over to the beach, that Roberts stayed in the getaway car while Santos, Griffin and defendant got out of the car once they had located their victims, that Santos, Griffin and defendant simultaneously accosted the victims, that defendant and Griffin knew Santos had a gun, and that all four accomplices fled the scene together.

Indulging all reasonable inferences from the evidence in favor of the judgment, it cannot be said that defendant's participation in accosting Mr. Ulber did not aid the acts of Santos who attacked Mr. Fietze and demanded money, and Griffin who grabbed and held onto Mrs. Ulber. There is substantial evidence supporting defendant's accomplice liability for the attempted robberies of both Mr. Fietze and Mrs. Ulber. (See *People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743 ["The 'act' required for aiding and abetting liability need not be a substantial factor in the offense. ' "Liability attaches to

21

anyone 'concerned,' however slight such concern may be, for the law establishes no degree of the concern required to fix liability as a principal."]; *People v. Campbell* (1994) 25 Cal.App.4th 402, 409 [" 'factors which may be considered in making the determination of aiding and abetting are:  presence at the scene of the crime, companionship, and conduct before and after the offense' "]; *People v. Nguyen* (1993) 21 Cal.App.4th 518, 531-532 [perpetrator need not expressly communicate criminal purpose that is apparent from the circumstances as "[a]iding and abetting may be committed 'on the spur of the moment,' . . . as instantaneously as the criminal act itself"].)

Moreover, defendant's suggestion there is no logical connection between the attempted robberies and the murder of Mr. Fietze is wholly unpersuasive.  The evidence discussed above supports defendant's conviction for murder under the felony murder rule.  (*People v. Cavitt* (2004) 33 Cal.4th 187 (*Cavitt*).)

**3.     The Jury Instructions**

Defendant contends there was prejudicial instructional error on the following grounds:  (1) refusing to instruct with defendant's requested CALCRIM No. 402 on the natural and probable consequences doctrine, resulting in incomplete and misleading instructions on aiding and abetting liability; (2) instructing with a modified version of CALCRIM No. 540B on coparticipant liability for felony murder, resulting in the omission of a critical element of liability under the felony murder rule; (3) refusing to instruct with defendant's requested CALCRIM No. 549 defining one continuous transaction; and (4) cumulative prejudice resulting from the multiple instructional errors.

We review a claim of instructional error de novo.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 217; *People v. Burch* (2007) 148 Cal.App.4th 862, 870 [validity and impact of jury instructions reviewed independently because "question is one of law and the application of legal principles"]; see also *People v. Smith* (2008) 168 Cal.App.4th 7, 13 [propriety of jury instructions determined from the entire charge from the court and not from consideration of specific instructions in isolation].)  We find no instructional error.

22

### a. Forfeiture

Respondent argues defendant forfeited his argument as to CALCRIM Nos. 402 and 540B by failing to object in the trial court. Defendant contends his substantial rights were affected by the erroneous instructions and therefore, under section 1259, any instructional error was not forfeited by the failure of trial counsel to object.

Defendant's written proposed list of jury instructions included requests for CALCRIM Nos. 402, 540B and 549. Shortly before the close of evidence, the parties had an off-record discussion with the court regarding jury instructions. Once back on the record, the court stated its intention to read numbers of the instructions it intended to give the jury, and then allow the parties to state any objections. The list of instructions read by the court did not include defendant's requested CALCRIM Nos. 402 and 549.

Defendant thereafter made several arguments and objections concerning the inclusion and exclusion of certain instructions, including CALCRIM No. 549, but did *not* object to the court's exclusion of CALCRIM No. 402. After the close of evidence, the court instructed the jury with the agreed-upon list of instructions. The modified version of CALCRIM No. 540B, which was included by the court, did not contain the optional language regarding the logical connection or one continuous transaction rule.[6] The following morning, the court asked counsel, outside the presence of the jury, if either of them had any objections to the instructions as read by the court. Both counsel said no.

Defendant forfeited objections to CALCRIM No. 402 and the modified form of CALCRIM No. 540B. However, to the extent defendant's substantial rights may have been affected, we briefly discuss the merits regarding those two instructions. We also discuss CALCRIM No. 549 to which a proper objection was raised below.

---

[6] The modified version of CALCRIM No. 540B at issue here was the version in effect in 2011. The optional language (element 5) has since been removed from CALCRIM No. 540B. (See Aug. 2013 ed. rev.)

### b. CALCRIM No. 402

Defendant contends the court's refusal to instruct with CALCRIM No. 402 misled the jury on aiding and abetting liability.

The instructions given on aiding and abetting liability (CALCRIM Nos. 400 and 401) were accurate statements of the law. The jury was also given CALCRIM Nos. 416 (Evidence of Uncharged Conspiracy), 417 (Liability for Coconspirators' Acts) and 418 (Coconspirators' Statements), and was instructed on CALCRIM No. 540B (Accomplice Liability for Felony Murder).

The court properly declined to instruct the jury with CALCRIM No. 402 on the natural-and-probable-consequences doctrine. Liability for a homicide committed during the commission of an enumerated felony includes homicides that may *not* have been intended or reasonably foreseeable. (*Cavitt*, *supra*, 33 Cal.4th at p. 197 [purpose of felony murder rule is to deter homicides by holding cofelons strictly responsible for any killing committed during enumerated felony whether intentional, negligent or accidental].) "The felony-murder rule is not in fact limited to killings which seem 'probable'; it includes 'a variety of unintended homicides resulting from reckless behavior, or ordinary negligence, or pure accident; it embraces both calculated conduct and acts committed in panic or rage . . . . [*I*]*t condemns alike consequences that are highly probable, conceivably possible, or wholly unforeseeable*.' [Citation.]" (*People v. Anderson* (1991) 233 Cal.App.3d 1646, 1658.)

Defendant appears to suggest that the lack of an instruction on the natural and probable consequences doctrine resulted in the jury not being informed that it had to decide the degree of murder that was the natural and probable consequence of the underlying target felony. However, the underlying felony was attempted robbery, which is an enumerated felony in section 189, and murder committed in the commission of an enumerated felony is first degree murder *as a matter of law*. (*People v. Chun* (2009) 45 Cal.4th 1172, 1182; accord, *People v. Mendoza* (2000) 23 Cal.4th 896, 908; see also § 189 ["All murder which is . . . committed in the perpetration of, or attempt to

24

perpetrate, arson, rape, carjacking, robbery, burglary . . . is murder of the first degree."].) Defendant has failed to show any error in the court's refusal to give CALCRIM No. 402.

### c. CALCRIM No. 540B

Defendant contends it was error for the court to delete the logical connection or one continuous transaction language from CALCRIM No. 540B setting forth the elements of felony murder the prosecution must prove. Defendant argues the modified instruction therefore impermissibly lightened the prosecution's burden of proof.

The logical connection or one continuous transaction language, which was contained in the 2011 version of the instruction in effect at the time of trial, was *optional language*. Preceding the optional language was an instruction that read, "*Give element 5 if the court concludes it must instruct on causal relationship between felony and death*." (Former CALCRIM No. 540B (Summer 2011 ed.), pp. 304-305.) The bench notes advised that the optional element 5 language should be given "*if* the evidence raises an issue over the causal connection between the felony and the killing. In addition, the court may give this bracketed element at its discretion in any case in which this instruction is given." (*Id*. at p. 306, italics added.)

The evidence did not raise any issue about the logical or causal connection between the underlying felony and the murder. The acts of attempted robbery against the victims and the resulting murder of Mr. Fietze happened virtually simultaneously. The court did not err in refusing to give the optional language. (*Cavitt*, *supra*, 33 Cal.4th at pp. 203-204.)

### d. CALCRIM No. 549

Defendant contends the court erred in refusing to give his requested instruction on the one continuous transaction rule.

CALCRIM No. 549 was revoked in August 2013. However, at the time of trial, the bench notes for CALCRIM No. 549 stated a similar advisement as CALCRIM No. 540B, namely that the instruction should only be given *if* the evidence raised an issue of whether the predicate felony and the murder were part of one continuous transaction. Defendant fails to explain how any reasonable jury could find that the attempted

robberies and the murder of Mr. Fietze were anything but one continuous transaction. For the same reasons discussed above with respect to CALCRIM No. 540B, we find there was no error in refusing to give CALCRIM No. 549.

## 4.     The Sentence Must Be Modified

Respondent urges this court to modify the sentence as follows:  the determinate term on count 6 (attempted robbery of Mr. Fietze) to be ordered stayed, and the concurrent terms on counts 7 and 8 (attempted robberies of Mr. and Mrs. Ulber) to be ordered to run consecutive, not concurrent, to the sentence on count 5 (murder of Mr. Fietze).  Defendant did not raise this issue on appeal, but in his reply brief, joins in respondent's request.

"[A] criminal defendant's 'sentence for both felony murder and the underlying felony violate[] the . . . Double Jeopardy Clause['s] . . . protection against "multiple punishments for the same offense" imposed in a single proceeding.  [Citation.]' [Citations.]" (*People v. Wader* (1993) 5 Cal.4th 610, 670.)  When such a sentence has been imposed, *Wader* explains the appropriate remedy is to vacate the sentence for the underlying felony.  In *Wader*, the trial court had stayed the sentence for the robbery count, so the defendant was protected against the harm of multiple punishment, and there was no need to vacate the sentence.  (*Ibid*.)

Here, both defendant and respondent join in the request to order the count 6 sentence stayed and order the concurrent terms on count 7 and 8 to be consecutive instead.  We agree the sentence on count 6 should be vacated or stayed, and the sentence for counts 7 and 8 should be ordered to be consecutive and not concurrent.  We do not exercise discretion in sentencing on appeal, of course, but we agree with defendant and respondent that the trial court clearly intended the sentences on those counts to be consecutive, because the court imposed one third the midterm on both counts, which is a lawful sentence only if the term is to run consecutively to the base term.  We therefore order the judgment modified accordingly.

## DISPOSITION

The sentence is modified only in the following respects:  the determinate six-year term on count 6 is stayed pursuant to Penal Code section 654 and *People v. Wader* (1993) 5 Cal.4th 610; and, the determinate 16 month terms on counts 7 and 8 are ordered to run consecutive, not concurrent, to the term imposed in count 5.  In all other respects, the judgment of conviction is affirmed.  The Superior Court shall prepare a modified abstract of judgment consistent with this opinion and transmit same to the Department of Corrections and Rehabilitation forthwith.

GRIMES, J.

We concur:

RUBIN, Acting P. J.

FLIER, J.

27